**Diane D. DICK, Plaintiff,**

v.

**PHONE DIRECTORIES COMPANY, INC., Defendant.**

No. 2:01–CV–785TC.

United States District Court, D. Utah, Central Division.

June 4, 2003.

Mark C. McLachlan, Salt Lake City, UT, for Plaintiff.

Matthew M. Durham, Justin B. Palmer, Stoel Rives LLP, Steven K. Gordon, Gabriel S. Clark, Durham Jones & Pinegar, Salt Lake City, UT, for Defendant.

**ORDER**

CAMPBELL, District Judge.

Plaintiff Diane Dick brings this employment discrimination action against Defendant Phone Directories Company, Inc. ("PDC"), alleging (1) same-sex hostile work environment harassment in violation of Title VII, (2) retaliation, and (3) negligent failure to train, instruct, supervise, and implement policy and procedure.

For the reasons set forth below, the court concludes that the harassment Ms. Dick complains of was not because of her sex. The court also concludes that Ms. Dick was not subject to an adverse employment action. Accordingly, PDC is granted summary judgment on Ms. Dick's Title VII claims, and the court declines to exercise supplemental jurisdiction over her remaining negligence claim pursuant to 28 U.S.C. § 1367 (2003).

### Facts

Ms. Dick was hired as an inside sales consultant in PDC's Vernal, Utah office in June of 1997. Her job involved selling Yellow Pages over the phone and explaining different advertising programs to customers. A new Vernal office supervisor, Laura Bills ("Ms.Bills") was hired around September 2000. The conduct Ms. Dick complains of began approximately a month after Ms. Bills was hired, and persisted for four or five months.

Ms. Dick's factual allegations describe a working environment permeated by sexually explicit banter, insults, lewd jokes, gestures, games, and devices. There were four central participants in the conduct, all female co-workers (collectively, "co-workers") who were not in supervisory or managerial positions. One woman, Camie Hinkle, is central to Ms. Dick's claims of harassment.[1] The parties' pleadings provide an extensive, painstaking inventory of the conduct forming the basis of this ac-

---

1. Ms. Dick further complains that PDC employees with supervisory authority over her, particularly Ms. Bills and an Inside Sales Department Supervisor named Jason Davis

tion, much of which is irrelevant to the analysis here. Accordingly, the particular details of Ms. Dick's factual allegations will be described only generally and to the extent necessary to decide the issues before the court, "in the interest of both brevity and dignity." *Oncale v. Sundowner Offshore Servs.*, 523 U.S. 75, 76, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998).

PDC does not dispute that the office environment giving rise to this case was unusually raucous and vulgar. But PDC argues that the conduct, although offensive, is not actionable under the legal theories Ms. Dick advances. For the reasons that follow, the court agrees.

### Analysis

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir.1998).

The party moving for summary judgment bears the initial burden of demonstrating that there is an absence of evidence to support the non-moving party's case. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548; *Adler*, 144 F.3d at 670–71. A movant "may make its prima facie demonstration simply by pointing out to the court a lack of evidence for the nonmovant on an essential element of the nonmovant's claim." *Adler*, 144 F.3d at 671. In applying this standard, the court views the factual record and construes all facts and reasonable inferences from it in the light

most favorable to the nonmovant. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Adler*, 144 F.3d at 670; *Aramburu v. Boeing Co.*, 112 F.3d 1398, 1402 (10th Cir.1997).

Once the moving party has carried its initial burden, Rule 56(e) requires the nonmovant to "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant." *Adler*, 144 F.3d at 671 (quoting Fed.R.Civ.P. 56(e)). The specific and pertinent facts put forth by the nonmovant "must be identified by reference to an affidavit, a deposition transcript or a specific exhibit incorporated therein." *Thomas v. Wichita Coca–Cola Bottling Co.*, 968 F.2d 1022, 1024 (10th Cir.1992). Mere allegations and references to the pleadings will not suffice. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

### A. *Title VII Same–Sex Sexual Harassment Claim*

In its Motion for Summary Judgment, PDC argues that Ms. Dick's Title VII claim cannot survive because there is no evidence to show that Ms. Dick was discriminated against because of sex. Under Title VII, discrimination against "any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's ... sex" is an unlawful employment practice. 42 U.S.C. § 2000e–2(a)(1). Accordingly, to be actionable, the Title VII claim must be supported by evidence that (1) the harassment constitutes discrimination "because of sex,"[2] and (2) the conduct is sufficiently

---

("Mr.Davis"), failed to prevent or to curtail the harassment.

**2.** The Seventh Circuit Court of Appeals in *Spearman v. Ford Motor Co.* commented that "Congress intended the term 'sex' to mean

"severe or pervasive ... to create an objectively hostile or abusive work environment." *Oncale,* 523 U.S. at 81, 118 S.Ct. 998 (citing *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), and *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). Because the court concludes that the harassment Ms. Dick endured was not "because of sex," the *Meritor/Harris* "sufficiently severe or pervasive" test need not be reached.

*Discrimination "Because of Sex"*

The Tenth Circuit Court of Appeals has explained that "[a]ny harassment of an employee 'that would not occur but for the sex of the employee ... may, if sufficiently patterned or pervasive, comprise an illegal condition of employment under Title VII.'" *Gross v. Burggraf Constr. Co.,* 53 F.3d 1531, 1537 (10th Cir.1995) (internal quotation omitted). However, " '[i]f the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment." *Id.* (quoting *Stahl v. Sun Microsystems, Inc.,* 19 F.3d 533, 538 (10th Cir. 1994) (emphasis omitted)). The United States Supreme Court has emphasized that workplace harassment is not "automatically discrimination because of sex merely because the words used have sexual content or connotations." *Oncale,* 523 U.S. at 80, 118 S.Ct. 998. "There is a significant distinction between harassment that is sexual in content and harassment that is sexually motivated, and Title VII is only concerned with the latter." *English v. Pohanka of Chantilly, Inc.,* 190 F.Supp.2d 833, 840 (E.D.Va.2002). Furthermore, Title VII was not intended to be "a general civility code for the American

workplace." *Oncale,* 523 U.S. at 80, 118 S.Ct. 998. The critical issue is "whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed." *Id.* (quoting *Harris,* 510 U.S. at 25, 114 S.Ct. 367 (Ginsberg, J., concurring)).

In the past, the Tenth Circuit has applied what has been called a "sex per se" rule,[3] holding that when harassing conduct is overtly sexual in nature, it may be presumed to be because of sex. *Penry v. Fed. Home Loan Bank of Topeka,* 155 F.3d 1257, 1261 (10th Cir.1998); *O'Shea v. Yellow Tech. Servs., Inc.,* 185 F.3d 1093, 1099 (10th Cir.1999). But, unlike the allegations made by Ms. Dick, neither *Penry,* 155 F.3d at 1261, nor *O'Shea* 185 F.3d at 1099. concerned a same-sex hostile work environment claim. As *Oncale* and cases following *Oncale* have pointed out, inferences that are available when a person of one sex uses sexually explicit language or gestures toward a person of the opposite sex are not necessarily available when both persons are of the same sex. *Oncale,* 523 U.S. at 80, 118 S.Ct. 998; *Lack v. Wal-Mart Stores, Inc.,* 240 F.3d 255, 260 (4th Cir.2001). Indeed, "the causation element poses an especially formidable obstacle in same-sex harassment cases." *Lack,* 240 F.3d at 260.

The *Oncale* Court provided three evidentiary routes by which a plaintiff can prove that "the [same-sex harassing] conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimina[tion] ... because of ... sex.'" *Oncale,* 523 U.S. at 80, 118 S.Ct. 998 (emphasis added). The first of these consists of "evidence that the same-sex harasser was homosexual and the

---

'biological male or biological female,' and not one's sexuality or sexual orientation." 231 F.3d 1080, 1084 (7th Cir.2000).

3. *See* David S. Schwartz, *When is Sex Because of Sex? The Causation Problem in Sexual Harassment Law,* 150 U. Pa. Law Rev. 1697, 1719–25 (2002).

harassment [was] motivated by sexual desire." *Ciccotto v. LCOR, Inc.*, No. 99 CIV. 11646(RMB), 2001 WL 514304, at *4 (S.D.N.Y. Jan.31, 2001) (citing *Oncale*, 523 U.S. at 80, 118 S.Ct. 998); *see also Moran v. Fashion Inst. of Tech.*, No. 00 CIV 1275(KMW), 2002 WL 31288272, at *5 (S.D.N.Y. Oct.7, 2002) (citing *Ciccotto*, 2001 WL 514304, at *4). The second is evidence that the harasser was "motivated by a [general] hostility to the presence of [members of the plaintiff's sex] in the workplace." *Ciccotto*, 2001 WL 514304, at *4 (citing *Oncale*, 523 U.S. at 80, 118 S.Ct. 998) Finally, the third is direct, comparative evidence "that the harasser treated males and females differently in a mixed-sex work environment." *Id.* (citing *Oncale*, 523 U.S. at 81, 118 S.Ct. 998). It is apparent from Ms. Dick's pleadings and her attorney's argument during the hearing on this motion that she relies on the first evidentiary route, arguing that several of her alleged harassers were lesbians and that the Vernal office itself was known as "the lesbian factory." (*See, e.g.,* Pl.'s Mem. Opp. Mot. Summ. J. at 4, 6, 8, 55–56, 58–61.)

To survive summary judgment, then, Ms. Dick must provide evidence that (1) her same-sex harassers were homosexual, and (2) that they were motivated by sexual desire. *Ciccotto*, 2001 WL 514304, at *4 (citing *Oncale*, 523 U.S. at 80, 118 S.Ct. 998).

(1) *Has Ms. Dick produced admissible evidence that her harassers were homosexual?*

■ Under the evidentiary route she has chosen, Ms. Dick must first produce evidence that her alleged harassers were homosexual. *See Oncale*, 523 U.S. at 80, 118 S.Ct. 998. In her opposing memorandum, Ms. Dick has alleged that only three of her harassers were homosexual:[4] Ms. Bills, a co-worker named Teena Northern, and another co-worker named Dee Coleman. Ms. Dick has produced no admissible evidence supporting her conclusion that Ms. Coleman was homosexual.[5] Furthermore, assuming without deciding that

---

**4.** One central theme animating Ms. Dick's memorandum is her insistence that a strong lesbian atmosphere prevailed in the office, and that the Vernal Office was known as the "lesbian factory." For example, Jackie Ivie testified in her deposition that the Vernal office had developed a reputation in the community for being "the lesbian factory." (Deposition of Jacqueline Ivie ("J. Ivie Dep.") at 19:11–18.) Similarly, Marcie Young testified that she "remember[ed] hearing that uptown at Betty's Restaurant about the lesbian factory next door," and that she had heard it referred to in that way probably two or three times. (Deposition of Marcie Young ("Young Dep.") at 18:15–19, 35:3–18.) And Carrie Keller testified that a trucker in a coffee shop asked her if she worked for "that lesbian factory." (Deposition of Carrie Keller ("Keller Dep.") at 26:1–8.) This evidence clearly consists only of hearsay and double hearsay statements, which would not be admissible at trial and therefore cannot create a genuine issue of disputed fact. *See Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir.1998) (citing Fed.R.Civ.P. 56(e)). And Ms. Dick's conclusion that a strong lesbian atmosphere prevailed is just that—a conclusion, and a bare assertion on her part. As such, it does nothing to create a genuine issue of material fact relevant to her hostile work environment claim. Likewise, her conclusion (derived from a hearsay statement of a co-worker) that the office used "rainbow colors ... symbolizing gay pride" on the numbers board (Deposition of Diane Dick ("Dick Dep." at 89:11–25)) does not raise a disputed factual issue.

**5.** For example, the relevant parts of the record are Ms. Dick's conclusory statement that Ms. Coleman "had decided to become a lesbian" (Dick Dep. at 120:7–15), co-worker Jackie Ivie's statement that Ms. Coleman had told Ms. Ivie that she was a lesbian (J. Ivie Dep. at 52:15–19); and that Ms. Coleman's husband had told Ms. Dick that "he was losing his wife and he was sick and tired of it and she was turning into a lesbian." (Dick Dep. at 139:22–23.)

Ms. Dick has produced admissible evidence that Ms. Bills and Ms. Northern were lesbians, neither of these two women participated significantly in harassing Ms. Dick. The record is devoid of any evidence of harassment by Ms. Northern, except for the fact that she informed Ms. Dick that because of her complaining and making waves, "they" (presumably, the Vernal PDC office) were out to fire Ms. Dick. (Dick Dep. at 65:1–7, 66:4–9). Likewise, even if the record demonstrates that Ms. Bills belittled or ignored Ms. Dick's pleas for corrective action,[6] and that she failed to prevent or curtail the harassment, it does not show that she herself participated in harassing Ms. Dick. There is one exception to this conclusion that the Ms. Bills did not directly participate in harassing Ms. Dick. Ms. Dick alleges that someone in the office had hung a three to four-inch rubber penis from the ceiling above co-worker Camie Hinkle's desk, (*Id.* at 50:13–51:7 & 24–25), and that when the penis fell down from the ceiling, it was Ms. Bills who re-hung it, (*Id.* at 56:7–17). But there is no evidence that this isolated action by Ms. Bills was in any way directed toward Ms. Dick.

The only alleged harasser whose conduct is relevant to the "homosexual harasser" inquiry is Ms. Hinkle, who the record reveals to be one of the most physically and verbally demonstrative harassers. Ms. Dick herself does not allege that Ms. Hinkle was homosexual, and, as discussed more fully below, has conceded that she "[didn't] know [Ms. Hinkle's] true sexual preference." (*Id.* at 8–9.) However, Ms. Hinkle made sexually-charged gestures toward both Ms. Dick and other co-workers, including in relevant part (1) reaching into both Ms. Dick's and Ms. Bills's blouses and pinching their breasts, (*Id.* at 31:9–12); (2)

coming up behind Ms. Bills and another co-worker, Andrea Snow, and "bodily butt humping" them, (*Id.* at 25:14–16, 33:14–25, Young Dep. at 37:17–25); and (3) "rubbing [her foot] up and down" in Ms. Bills's crotch while (on one occasion) saying, " 'Yo, buff bitch. How does that feel? Yo, buff bitch. You like that?' " (Dick Dep. at 56:7–17, J. Ivie Dep. at 7:25–8:8). Accordingly, the relevant inquiry is narrowed to the question of whether Ms. Hinkle discriminated against Ms. Dick because of sex under *Oncale's* first evidentiary route.

Although the Tenth Circuit has not yet had occasion to answer the question of what evidence of homosexuality is required under *Oncale*, the Seventh, Ninth, and (most recently) Fifth Circuits have addressed that issue. In *La Day v. Catalyst Technology, Inc.*, the Fifth Circuit was asked to decide whether there was "credible evidence" that a harasser was homosexual. 302 F.3d 474, 480 (5th Cir.2002). The plaintiff presented evidence that the harasser told the plaintiff that he was jealous of the plaintiff's girlfriend, fondled the plaintiff's anus, and had touched other employees (or proposed sex with them) in similar ways. *Id.* at 476–77. The *La Day* Court reviewed cases in which the two other circuit courts had considered the question of whether a harasser was homosexual, *Rene v. MGM Grand Hotel, Inc.*, 243 F.3d 1206 (9th Cir.2001), *reh'g en banc granted*, 255 F.3d 1069 (9th Cir.2001), *rev'd on reh'g*, 305 F.3d 1061 (9th Cir. 2002), *cert. denied, MGM Grand Hotel, LLC. v. Rene*, — U.S. —, 123 S.Ct. 1573, 155 L.Ed.2d 313 (2003) and *Shepherd v. Slater Steels Corp.*, 168 F.3d 998 (7th Cir.1999). In the *Rene* case, the court found no evidence that any of the plaintiff's harassers were homosexual,[7] even

---

**6.** The "Do's and Don'ts" memo Ms. Bills drafted, discussed below, is evidence that Ms. Bills made at least one attempt to address the harassment, even if Ms. Dick found this effort to be less than sincere.

**7.** The court found that the harassers were motivated not by sexual desire, but by a desire to humiliate the plaintiff. *Rene*, 243 F.3d at 1209.

where the alleged "sexual harassment consisted of, among other things, being grabbed in the crotch and poked in the anus on numerous occasions, being forced to look at pictures of naked men having sex while [ ] co-workers looked on and laughed, being caressed, hugged, whistled and blown kisses at, and being called 'sweetheart' and 'Muneca' [meaning 'Doll']." *Rene*, 243 F.3d at 1207. On the other hand, the *Shepherd* Court did find "evidence in the record suggesting that [the harasser's] harassment of [the plaintiff] was borne of sexual attraction." *Shepherd*, 168 F.3d at 1009. In *Shepherd*, the harasser remarked a number of times that the plaintiff was a " 'handsome young man,' " and, "in one of the more graphic encounters between the two men, ... 'rubbed himself into an erection' while [the plaintiff] was laying [sic] on his stomach with cramps," warning him to turn over, "lest he 'crawl up on top of [Shepherd] and fuck [him] in the ass.' " *Id.* (citations omitted) Furthermore, on other separate occasions, the *Shepherd* harasser informed the plaintiff that "[a] man can come if he's fucked in the ass," and offered to give the plaintiff "a nice hot shower" when the plaintiff complained of soreness from a fall he had taken. *Id.* at 1009–10. The *Shepherd* Court reasoned that "[a]lthough none of these incidents necessarily proves that [the harasser] is gay ... the connotations of sexual interest in [the plaintiff] certainly suggest that [the harasser] might be sexually oriented toward members of the same sex. That possibility leaves ample room for the inference that [the harasser] harassed Shepherd because Shepherd is a man." *Id.* at 1010.

The *La Day* Court distilled these two cases to a conclusion that "two types of evidence ... are likely to be especially 'credible' proof that the harasser may be a homosexual." *La Day*, 302 F.3d at 480. The first is "evidence suggesting that the harasser intended to have some kind of sexual contact with the plaintiff rather than merely to humiliate him for reasons unrelated to sexual interest." *Id.* The second is "proof that the alleged harasser made same-sex sexual advances to others, especially to other employees." *Id.* The court further reasoned that "[a] harasser may well make sexually demeaning remarks and putdowns to the plaintiff for sex-neutral reasons, as in *Rene*, but he is far less likely to make sexual *advances* without regard to sex." *Id.* Ultimately, the court found that the plaintiff survived summary judgment because there was evidence that the harasser had sexual interest in the plaintiff and had made "sexual advances both to the [plaintiff] and to other employees." *Id.*

Under the *La Day* test, Ms. Hinkle's conduct—specifically her attempts to pinch Ms. Dick's breasts on two occasions—was certainly, in the words of *La Day*, "sexually demeaning." *La Day*, 302 F.3d at 480. But the evidence does not show that Ms. Hinkle had a sexual interest in Ms. Dick, as required to satisfy the first prong of the test. Ms. Hinkle's conduct falls within the category of "mere humiliation." [8] This conclusion is borne out from Ms. Dick's own deposition testimony:

A [by Ms. Dick]:—[Ms. Bills] would come out and [Ms. Hinkle] would get up and run over there and shove her hands down and pinch her breasts. [Ms. Hin-

8. As discussed more fully below, the *Oncale* Court noted that "[c]ommon sense, and an appropriate sensitivity to social context" are critical in deciding whether conduct is "simple teasing or roughhousing among members of the same sex" or whether it is actionable under Title VII. *Oncale*, 523 U.S. at 82, 118 S.Ct. 998. Although this "context" language related to the "objective severity of the harassment" analysis in *Oncale*, courts have found it "apropos" to the causation question as well. *Shepherd*, 168 F.3d at 1010.

kle] tried that twice with me and I told her, "Get the hell away from me."

Q: Is [Ms. Hinkle] a lesbian or is [she] straight or do you know?

A: I don't know. I don't know.

Q: Would you characterize what she did as horseplay or was she making sexual overtures to [Ms. Bills]? How would you characterize that?

A: Both.

Q: You think she was making advances to [Ms. Bills]?

A: Well, she did it on a routine basis. Why would you do something like that? . . .

Q: In your experience, do you think it was horseplay?

A: I really think it was a little of both.

Q: When she tried to touch you, do you think she was making a sexual overture to you or do you think she was engaging in horseplay?

A: She—I don't know. At that point I was just kind of like—I don't know what to think. I don't know her true sexual preference, so I really can't state that, I just know that it was very offensive to have another woman touch my personal parts.

Q: Did you see it as a sexual overture?

A: Well, sure.

Q: You believed that [Ms. Hinkle] was making a sexual—

A: Well, I mean—

Q: Let me finish my question so we don't talk at the same time.

A: Okay.

Q: Did you believe [Ms. Hinkle] was making a sexual advance? Do you believe she was interested in a sexual relationship with you?

A: I think she was just harassing me and using the sexual overtures as a

way of doing it because she knows that I didn't like it. *The sexual overtures and gestures were a way of doing it because she knew that I did not like the constant gay overtones and actions in the office.*[9]

Q: Was she—do you believe she was attracted to you?

A: No. *I could not say what her true intentions were. I have no way of knowing what her motives were. But, she knew that it upset me.*

Q: Okay. So you believed it was sort of—certainly something you were uncomfortable with and—

A: It was something that she did to aggravate me. She knew how uncomfortable I was. It would throw me off my work.

Q: Did [Ms. Hinkle] do this to anyone other than you and [Ms. Bills]?

A: Andrea Snow. She would butt hump Andrea Snow.

(Dick Dep. at 31:9–33:17, Correction Sheet at 274.) This testimony, even with the italicized corrections added by Ms. Dick following her review of her testimony, reveals that Ms. Dick viewed Ms. Hinkle's actions as a means to "aggravate," "upset," or "make uncomfortable," not as a way to initiate actual sexual contact with Ms. Dick. Under *La Day,* such facts form an inadequate basis from which to draw the inference that Ms. Hinkle was gay.

Nor can Ms. Hinkle's conduct toward other employees, particularly that directed toward Ms. Bills (the "butt humping," breast pinching, and foot in the crotch episodes described above), be construed as "sexual advances to other employees" sufficient to satisfy the second, alternative prong of the *La Day* test. *See Ciccotto,*

---

**9.** Italicized portions of the deposition testimony are corrections that Ms. Dick added following the deposition, and which are attached to the deposition at Exhibit 2 of Ms. Dick's opposing memorandum. (Dick Dep., Correction Sheet at 274.)

2001 WL 514304 at *4 (citing *Oncale*, 523 U.S. at 80, 118 S.Ct. 998). Two cases are instructive on this issue. In *English v. Pohanka of Chantilly, Inc.*, the court found that the plaintiff had "no reason (other than the behavior of which he complains) to believe that [the harasser] [was] a homosexual." 190 F.Supp.2d 833, 846 (E.D.Va.2002) (quoting *Davis v. Coastal Int'l Sec., Inc.*, 275 F.3d 1119, 1123 (D.C.Cir.2002)). The male harasser in that case, Dutchburn, was well-known in the office for being "touchy feely." *Id.* at 836. With respect to the plaintiff himself, Dutchburn expressed a desire to "plant his salami between [the plaintiff's] cheeks" and invited the plaintiff to "smoke the peace pipes . . . you know the bones." *Id.* at 845. However, he also indiscriminately subjected co-workers (both male and female) to unwelcome touching and undifferentiated comments reflecting his desire "to plant his salami between someone's cheeks." *Id.* at 836–37, 845. In short, Dutchburn "got on just about everyone's nerves." *Id.* at 836, 844, 847. The *English* court found that these facts were insufficient to support a finding that Dutchburn's harassment was "because of sex." *Id.* at 847–48. Similarly, in *Lack v. Wal–Mart Stores, Inc.*, the male harasser, Bragg, "did not limit his jokes, lewd behavior, or sexual attention to [the plaintiff] individually, or to men more generally." 240 F.3d 255, 261 (4th Cir.2001). As in *English*, the *Lack* court held that the harasser's conduct was not "because of sex." *Id.* at 262.

The facts of Ms. Dick's case—where no one in the PDC office was exempt from Ms. Hinkle's lewd comments and gestures—resemble those of *English*, 190 F.Supp.2d at 846, and *Lack*, 240 F.3d at 261. For example, in addition to the evidence showing that Ms. Hinkle "bodily butt humped" Ms. Bills and Ms. Snow and that she pinched Ms. Bills' and Ms. Dick's breasts, there is also testimony that Ms. Hinkle made sexual gestures on a daily basis (Dick Dep. at 28:6–13); that she (along with Ms. Coleman and Ms. Snow) got a pillow, put it on the floor, said it was going to be used as their "cocksucking pillow," and simulated sexual acts (*Id.* at 63:11–22); and that she (along with Ms. Snow) inserted a flashlight penis into her mouth, pretending that she was performing a "blow job" (*Id.* at 41:9–12).

Furthermore, bearing in mind *Oncale's* guidance that "[t]he critical issue . . . is 'whether members of one sex are exposed to disadvantageous terms or conditions of employment to which members of the other sex are not exposed,' " it is noteworthy that men were treated no differently from women at PDC. *Oncale*, 523 U.S. at 80, 118 S.Ct. 998 (quoting *Harris*, 510 U.S. at 25, 114 S.Ct. 367) (Ginsberg, J., concurring). There were only two men who worked in the Vernal office during the time at issue. Ms. Dick alleges by way of inadmissible hearsay evidence that one of these two men was homosexual, "was considered just one of the girls," and "was included in their conversations." (Dick Dep. at 44:12–13; 123:8–19.) The other man was a returned missionary who, when "the girls would get really bad with the language and stuff," would "kind of turn bright red, start singing, but he would say that it didn't bother him, but everybody could kind of tell that it did." (Dick Dep. at 45:15–17.) When asked during her deposition whether the alleged harassers would "ever direct their conversations to the men in a different way or was it just sort of the same office environment," Ms. Dick responded that "[i]t was just the same office environment." (Dick Dep. at 45:12–14.)

The fact that, by Ms. Dick's own admission, everyone in the Vernal office of PDC was subjected to "the same office environment" (including almost daily sexual gestures) argues strongly against a finding

that anyone, including Ms. Hinkle, was making sexual overtures or advances to anyone else in a way that would draw an inference of homosexuality under the *La Day* test.

> (2) *Has Ms. Dick produced evidence that Ms. Hinkle was motivated by sexual desire?*

■ Even if Ms. Dick had produced evidence that Ms. Hinkle was homosexual, she must still demonstrate additionally that Ms. Hinkle was motivated by sexual desire. *Ciccotto*, 2001 WL 514304, at *4 (citing *Oncale*, 523 U.S. at 80, 118 S.Ct. 998). Case law following *Oncale* but prior to *La Day* required that a harasser's conduct be fueled by "actual desire" or "earnest sexual solicitation." *See, e.g., Davis*, 275 F.3d at 1123 (*Oncale's* first evidentiary route requires evidence "that the sexual behavior is motivated by actual homosexual desire"); *Bibby v. Philadelphia Coca Cola Bottling Co.*, 260 F.3d 257, 262 (3d Cir.2001) (first evidentiary route requires "evidence that the harasser sexually desires the victim"); *Lack*, 240 F.3d at 261 (evidence of "earnest sexual solicitation by a harasser will support an inference that the harassment was because of the plaintiff's sex"); *English*, 190 F.Supp.2d at 845 (same). These cases have also emphasized that "[w]hen evaluating whether harassment was because of sex, '*Oncale* holds that context matters.'" *English*, 190 F.Supp.2d at 844 (citing *Davis*, 275 F.3d at 1126 and citing *Lack*, 240 F.3d at 261 ("causation element must be analyzed in its proper context")); *see also Shepherd*, 168 F.3d at 1010 ("Whether the sexual content of the harassment is indicative of sex discrimination must therefore be examined with attention to the context in which the harassment occurs.") Accordingly, heeding *Oncale's* direction that courts apply "[c]ommon sense, and an appropriate sensitivity to social context," there is simply no evidence in this case to support a conclusion that Ms. Hinkle desired Ms. Dick sexually. *Oncale*, 523 U.S. at 82, 118 S.Ct. 998.

In *La Day*, for instance, the court rejected the defendants' argument on summary judgment "that even if there is evidence that [the harasser] is a homosexual . . . there is no proof that [he] made sexual overtures to La Day." 302 F.3d at 481. There, where the harasser had touched La Day's anus and expressed jealousy toward La Day's girlfriend, the court easily found that the harasser had made "explicit or implicit proposals of sexual activity." *Id.* (quoting *Oncale*, 523 U.S. at 80, 118 S.Ct. 998.) Likewise, in *Shepherd*, where the harasser repeatedly told the plaintiff that the plaintiff was "a handsome man" and " 'rubbed himself' into an erection as he threatened to sexually assault [the plaintiff]," the court concluded that this conduct was "anything but incidental," and was instead because of sex. *Shepherd*, 168 F.3d at 1011.

In contrast, this case is much more like the *Rene* case discussed in *La Day*, 302 F.3d at 479, or like *Johnson v. Hondo, Inc.*, 125 F.3d 408 (7th Cir.1997), discussed in *Shepherd*, 168 F.3d at 1010. The *Johnson* case involved a harasser's repeated insistence that the plaintiff and the plaintiff's girlfriend were going to "suck [the harasser's] dick." *Johnson*, 125 F.3d at 413. There, the court refused to find that such remarks constituted "some sort of homosexual advance," where the harasser commonly and indiscriminately stated that various people (male and female) were going to "suck [his] dick." *Id.* Thus, in *Johnson*, "the sexual references were essentially incidental to what was otherwise run-of-the-mill horseplay and vulgarity." *Shepherd*, 168 F.3d at 1010.

Likewise, in *Rene*, the court found that the plaintiff "presented no evidence that any of his harassers were homosexual, nor

that they were in any way motivated by sexual desire," despite evidence that the harassers grabbed the plaintiff in the crotch, poked him in the anus on numerous occasions, forced him to look at pictures of naked men having sex (laughing all the while), and called him "sweetheart" and "Muneca" (Spanish for "Doll"). *Rene*, 243 F.3d at 1207, 1209. This evidence, the court concluded, suggested "not that [the harassers] desired him sexually, but rather that they sought to humiliate him because of his sexual orientation." *Id.* at 1209. Ms. Dick's case is more readily aligned with *Rene* and *Johnson* than it is with *La Day* or *Shepherd*. Although Ms. Hinkle attempted to pinch Ms. Dick's breast two times, Ms. Dick has presented no statements like the "handsome young man" comment in *Shepherd*, 168 F.3d at 1000, or the "jealous of the girlfriend" comment in *La Day*, 302 F.3d at 479, that would imbue Ms. Hinkle's conduct with a quality of actual sexual desire or earnest sexual solicitation. Instead, as in *Rene*, 243 F.3d at 1209, and *Johnson*, 125 F.3d at 413, the breast pinching was at most an effort at humiliation. Furthermore, this physical gesture was entirely incidental to a record replete with evidence that Ms. Dick's harassers taunted her by taking broad liberties with her name, referring to her as "Ivanna Dick," "I want a dick," "the dickhead," and "Granny Dick," and by making comments like "Dick's got a pussy" or "Diane's got a pussy" in reference to Ms. Dick's Ty Beanie Baby cat collection. (Dick Dep. at 25:11–16, 38:6–15, 39:23–40:5, 68:10–12, 71:15–23); (Keller Dep. at 51:5–14); (Young Dep. at 78:1–9). Although Ms. Dick has provided an exhaustive litany of harassing conduct that she has suffered, none of it creates a question of fact about whether the harassment (and particularly Ms. Hinkle's pinching of her breasts) was an expression of sexual desire. As discussed above, this conclusion finds support in Ms. Dick's own deposition testimony,

corrections notwithstanding, where she admitted that she did not think Ms. Hinkle wanted to have a sexual relationship with her, but rather used sexual overtures as a way of "aggravating" or "upsetting" her. (Dick Dep. at 31:9–33:17, Correction Sheet at 274.)

Accordingly, Ms. Dick's Title VII same-sex hostile work environment claim fails for lack of evidence that the harassment she endured, however humiliating and sexually-charged, was because of sex.

### B. *Retaliation Claim*

Ms. Dick claims that PDC has retaliated against her in violation of Title VII. According to Title VII, "[i]t shall be an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). To establish a prima facie case of retaliation, Ms. Dick must show: (1) she engaged in protected opposition to Title VII discrimination or participated in a Title VII proceeding; (2) adverse action by the defendant employer subsequent to or contemporaneous with the plaintiff's protected activity; and (3) a causal connection between the protected activity and the employer's adverse action. *Jeffries v. State of Kansas*, 147 F.3d 1220, 1231 (10th Cir.1998). "A plaintiff may maintain an action for retaliation ... regardless of whether the conduct forming the basis of her underlying complaint is adjudged to violate Title VII." *Id.*

The parties do not dispute Ms. Dick's ability to establish the first element of her prima facie case. However, PDC contends that Ms. Dick has failed to put forth evi-

dence of any legally-cognizable "adverse action" by PDC. Ms. Dick alleges that she suffered the following adverse employment actions: (a) "increased harassment" from her fellow co-workers following her complaints; (b) Inside Sales Department Supervisor Jason Davis's ("Mr.Davis") instruction of co-workers Ms. Coleman and Ms. York to make a complaint against Ms. Dick with the Vernal Police Department; (c) Ms. Bills' distribution of a memo outlining Ms. Dick's complaints (in an attempt to "stir things up") and Mr. Davis's follow-up letter to Ms. Dick; (d) threats of termination; (e) Ms Dick's being "written up" after she complained about the conduct in the Vernal office; and (f) PDC's failure to make an effort to investigate Ms. Dick's complaints.

PDC, in turn, argues that these actions, even if proven, are not actionable under Title VII as "adverse employment actions." In recognition of Title VII's remedial nature, the Tenth Circuit has expressly taken a liberal approach to the "adverse employment action" inquiry, holding that the issue is decided on a case by case basis. *Wells v. Colorado Dep't of Transp.*, 325 F.3d 1205, 1212 (10th Cir.2003) (quoting *Heno v. Sprint/United Mgmt. Co.*, 208 F.3d 847, 857 (10th Cir.2000)); *see also Jeffries*, 147 F.3d at 1232. The liberal definition does not extend "to a mere inconvenience or an alteration of job responsibilities." *Petersen v. Utah Dep't of Corr.*, 301 F.3d 1182, 1189 (10th Cir.2002) (quoting *Heno* 208 F.3d at 857). The

Tenth Circuit has reiterated that to be an adverse action, the employer's conduct must be "materially adverse" to the employee's job status. *See Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 533 (10th Cir.1998). The United States District Court for the District of Kansas has said, in reviewing several Tenth Circuit cases finding actionable "adverse employment action," that "[c]ommon to these cases is that the alleged retaliatory act affected the terms and conditions of employment." *Fortner v. State of Kansas*, 934 F.Supp. 1252, 1267 (D.Kan.1996). As the following analysis demonstrates, Ms. Dick has failed to produce evidence that she has been subjected to adverse employment action on the part of PDC.

### (1) Increased Harassment/Co–Worker Hostility

▇ Ms. Dick argues that "[u]pon Plaintiff complaining to her supervisor regarding the hostile work environment sexual harassment, the frequency, magnitude and offensiveness of the conduct direct[ed] towards Plaintiff increased to a point where it became unbearable, and she was forced to take a temporary leave of absence from her employment with the Defendant." (Pl.'s Compl. at ¶ 24.) [10] The Tenth Circuit has held that "co-worker hostility or retaliatory harassment, if sufficiently severe, may constitute 'adverse employment action' for purposes of a retaliation claim." *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1264 (10th Cir.1998); *see also*

---

**10.** Although Ms. Dick does not pinpoint with any particularity the retaliatory harassment she describes in her Complaint (or the point in time when such harassment occurred), facts that seemingly go to this issue are: (1) her co-workers treating her like she "had cooties" after she filed her complaint; (Dick Dep. at 127:2–6); (2) remarks like "Diane doesn't like it" or "dickhead doesn't like it;" or referring to Ms. Dick as "the office bitch;" (*Id.* at 135:9–21; 253:2–7); and (3) one co-

worker's "threatening" email message to Ms. Dick, in which the co-worker told her she was being "backstabbing" and "paranoid," and said, "No one hates you or is trying to get you fired, we don't understand whats goin thru your head. But anyway, this all stops here ... in its tracks, don't try to pull anymore shit, we are not going to put up with it, we are a team and we must all get along." (Def's Mem. Supp. Mot. Summ. J. at Ex. 8.)

*Amro v. Boeing Co.,* 232 F.3d 790, 798 (10th Cir.2000) (hostility or harassment must be "sufficiently negative and pervasive" to affect the terms and conditions of the plaintiff's employment). Nonetheless, some co-worker hostility can "be attributed to an increase in predictable tension in office after a discrimination charge is filed," and is not adverse employment action. *Fortner,* 934 F.Supp. at 1268 (internal quotations omitted).

Here, Ms. Dick has put forth no evidence of increased harassment. In fact, as PDC points out, her claim of increased harassment is expressly contradicted by her own deposition testimony:

Q: So the retaliation was basically— what you claim was the retaliation was basically the same kind of conduct?

A: The same kind of conduct, that's correct.

Q: And it continued over what period of time?

A: Over the four- to five-month span.

Q: Did it increase and decrease or was it pretty much—

A: It was pretty steady. Every time I would complain, I would get the same results.

(Dick Dep. at 138:16–25.) Because Ms. Dick has not made any showing of increased harassment apart from the harassment forming the basis of her underlying Title VII claim, the court need not reach the question of whether the post-complaint harassment and hostility was "sufficiently severe" to be actionable under *Gunnell.*

*(2) Complaints to the Vernal Police Department*

■ As further evidence of adverse employment action, Ms. Dick claims that Inside Sales Department Supervisor Jason Davis directed two of her co-workers, Ms. Coleman and Ms. York, to file a complaint with the Vernal City Police against Ms. Dick because Ms. Dick had allegedly called a co-worker's house (and that co-worker's mother's house) unsolicited, and had allegedly entered another co-worker's house. (Dick Dep. at 103:11–14, 143:18–24, Deposition of Jason Davis ("Davis Dep.") at 73:11–16.) The Tenth Circuit has held that "malicious prosecution" or "filing of charges against a former employee" can constitute adverse employment action. *Berry v. Stevinson Chevrolet,* 74 F.3d 980, 986 (10th Cir.1996).[11] In *Berry,* as in this case, there was evidence that a defendant decisionmaker "caused individuals to report [a crime]." *Id.* The court reasoned that criminal prosecution, involving a public criminal trial, would have "an obvious impact" on "future employment prospects." *Id.* However, unlike the plaintiff in *Berry,* 74 F.3d at 986, Ms. Dick has not stood trial, and indeed has had no formal charges brought against her. Rather, her co-workers simply made complaints to the Vernal police, reportedly at Mr. Davis's suggestion, resulting in a police report.[12] (Def.'s Mem. Supp. M. Summ. J. at Ex. 7). There is no evidence on the record that the matter persisted beyond the filing of the report. Unlike the public criminal trial that the plaintiff in *Berry* was subjected to, the police report describing alleged incidents involving Ms. Dick does not "carr[y] a significant risk of humiliation,

---

**11.** Neither party has cited the *Berry* case, at least on this issue of whether the filing of criminal charges constitutes adverse employment action.

**12.** PDC correctly points out that a truthful report to the police about an employee does not constitute adverse employment action for purposes of a retaliation claim. *Aviles v. Cornell Forge Co.,* 241 F.3d 589, 593 (7th Cir. 2001).

damage to reputation, and a concomitant harm to future employment prospects." *Berry,* 74 F.3d at 986. Accordingly, the police report has not "affected the terms and conditions of [Ms. Dick's] employment," and cannot be considered an adverse employment action. *Fortner,* 934 F.Supp. at 1267.

### (3) Remedial Efforts by PDC: Ms. Bills's "Do's & Don't's in Your Office" Memo and Mr. Davis's Letter Requesting the Grounds for Ms. Dick's Claim.

█ As further evidence of retaliation, Ms. Dick points to two documents drafted by PDC supervisors. First, she argues that a "Do's & Don't's in Your Office" memo—admonishing Vernal Office employees not to be "loud and obnoxious in the office," not to "share personal gestures (such as Burps, Farts, Etc.)," and not to use "foul language"—was itself retaliatory in that it "stirred things up" and promoted more hostility toward Ms. Dick.(Dick Dep. at 145:9–16, 146:8–24.) Ms. Dick testified that although the Laura Bills prepared the memo, Ms. Bills pretended that it came from the corporate office, then failed to follow this memo herself. (*Id.* at 76:22–77:25; 217:24–218:14.) However, Ms. Dick has testified that she had expected that Ms. Bills would talk to her co-workers about the complaints in an attempt to remedy the problem. (*Id.* at 137:13–16). Indeed, as PDC points out, Title VII imposes a duty on PDC to reasonably investigate and address Ms. Dick's complaints. The court agrees with PDC that finding such a memo (ostensibly remedial in character) to be actionable retaliatory conduct would produce an absurd result, and that the "Do's and Don't's Memo" cannot be considered an adverse employment action for purposes of retaliation.

Ms. Dick further argues that Mr. Davis improperly demanded her attorney records in a letter to Ms. Dick dated May 18, 2002. But that letter on its face asks not for attorney records, but for a written, itemized list of complaints constituting the grounds for the sexual harassment lawsuit. (Def.'s Mem. Supp. Mot. Summ. J. at Ex. 10.) Such an action, like the "Do's and Don't's Memo," cannot be construed as an adverse employment action where it demonstrates an effort on PDC's part to ascertain and, presumably, to remedy the issues complained of. Furthermore, Ms. Dick has not shown that either the letter or the memo "affected the terms and conditions of [Ms. Dick's] employment." *Fortner,* 934 F.Supp. at 1267.

### (4) Threats of Termination

█ Ms. Dick also points to threats or suggestions of termination made by co-workers as "adverse employment actions." (Ms. Dick's employment was not terminated.) Tenth Circuit authority supports the proposition that, under certain circumstances, unrealized threats can constitute adverse employment action. *Jeffries v. State of Kansas,* 147 F.3d 1220, 1232 (10th Cir.1998). In *Jeffries,* involving a Title VII claim brought by a resident chaplain/student at a state hospital, the court found adverse employment action where the plaintiff's supervisor "told her he would not supervise her as a student, issued repeated threats that her contract would not be renewed at the end of the year, and refused to supervise her as a student for the duration of her employment." *Id.* The court reasoned that the plaintiff had suffered an adverse employment action because "the threat of non-renewal [of educational supervision] came from a person who indisputably had considerable influence over employment and work decisions," and because the employment term at issue (educational supervision) was uniquely dependent upon positive personal interactions between supervisor and student. *Id.* "In such a sit-

uation," the court further reasoned, "an educational atmosphere permeated by threats and distrust could certainly have a significant impact on the student's education and future opportunities." *Id.*[13]

Tenth Circuit in *Jeffries* did not disturb its earlier decision in *Cole v. Ruidoso Mun. Sch.*, 43 F.3d 1373 (10th Cir.1994). In *Cole,* the school principal orally informed the plaintiff, a teacher, "that her teaching would be evaluated three times during the school year, a standard procedure for beginning teachers but not for senior teachers such as Cole." *Id.* at 1381. The *Cole* court agreed with the district court and found "that this did not reach the level of an adverse employment action, since there was no suggestion that the requirement was ever adopted or carried out." *Id.*

In this case, the record contains evidence of only one direct threat of termination by a person with supervisory authority (including the power to hire and fire) over Ms. Dick. (*See* Dick Dep. at 256:8–9.) In that instance, Ms. Bills allegedly threatened to fire Ms. Dick if she went over the supervisor's head to complain to Mr. Davis. (*Id.* at 255:21–256:7.) Unlike the determinative facts in *Jeffries*, here there are no special circumstances of interpersonal relationship making the threat immediately damaging to any particular employment term, regardless of the threat's realization. *See Jeffries*, 147 F.3d at 1232. This single, unrealized threat of termination made by Ms. Bills cannot, under the relevant authority, raise a genuine issue of material fact, particularly where Ms. Dick remains in her position at PDC despite complaints to Mr. Davis.

To the extent that the threats of termination were made by people without supervisory authority, they cannot be said to have adversely affected Ms. Dick's employment, and are therefore not adverse employment actions. *See Wells v. Colorado Dep't of Transp.*, 325 F.3d 1205, 1214 (10th Cir.2003) (finding that threat of transfer came from a person without authority to transfer plaintiff). Moreover, to the extent that such threats were in fact made by supervisors but were repeated to Ms. Dick by co-workers, they are inadmissible hearsay, and therefore are insufficient to create a fact issue. *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998) (quoting Fed.R.Civ.P. 56(e)).

### (5) "Write-ups" or "Counseling Statements"

■ Ms. Dick maintains that a further example of adverse employment action was disciplinary action taken against her when she was "written up" (or issued a "counseling statement") for "making negative remarks about co-workers" immediately following a verbal altercation with Jackie Ivie (who was also written up). (Def.'s Reply Mem. Supp. Mot. Summ. J. at 35, Ex. 4, Dick Dep. at 150:6–21, J. Ivie Dep. at 33:13–25). There is authority in this circuit supporting the proposition that disciplinary action on the part of an employer can constitute adverse employment action. *Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1104 (10th Cir.1998); *Marx v. Schnuck Mkts., Inc.*, 76 F.3d 324, 329 (10th Cir.1996). However, in *Roberts,* the plaintiff received twenty warning letters, two suspensions, and a termination within two years of his complaint, and the record indicated that the more warnings the

---

**13.** Ultimately, the *Jeffries* court did not have to decide "whether threats can constitute 'adverse employment action' in and of themselves" because it found evidence that the supervisor, Dr. Outlaw, refused to supervise her work, thereby "depriv[ing her] of the educational benefit she contracted to receive with all of the attendant consequences." 147 F.3d at 1232–33.

plaintiff received, the more likely he would be terminated. *Roberts,* 149 F.3d at 1104. And in *Marx,* disciplinary action simply set in motion a retaliatory process that ended in termination of the plaintiff. 76 F.3d at 329. Here, the write-up, although a disciplinary action, has in no way affected the terms and conditions of Ms. Dick's employment. Hence, the sole write-up is not an adverse employment action.

### (6) PDC's Failure to Investigate

■ Ms. Dick claims that PDC's failure to adequately investigate her claims of harassment was itself an adverse employment action. The United States District Court for the Southern District of New York has held that "an alleged deficiency in an employer's internal complaint procedure or internal investigation of a sexual harassment complaint ... is not a retaliatory adverse employment action." *O'Dell v. Trans World Entm't Corp.,* 153 F.Supp.2d 378, 396 (S.D.N.Y.2001), *aff'd,* 40 Fed. Appx. 628, *available at* 2002 WL 1560266 (2d Cir.2002)(unpublished decision). In the absence of Tenth Circuit authority to the contrary, this court agrees that a retaliation claim does not provide the proper context in which to challenge the employer's investigatory shortcomings.

### C. Negligence Claim

Because summary judgment is granted on Ms. Dick's federal claims, the court declines to exercise supplemental jurisdiction over her negligent employment claim under 28 U.S.C. § 1367.

### ORDER

For the foregoing reasons, the court grants PDC's Motion for Summary Judgment, and the case against PDC is DISMISSED.

SO ORDERED this 4th day of June, 2003.