**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**FEB 11 2005**

**PATRICK FISHER**
**Clerk**

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

---

DIANE D. DICK,

      Plaintiff - Appellant,

      v.

PHONE DIRECTORIES COMPANY, INC.,

      Defendant - Appellee.

No. 03-4163

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF UTAH**
**(D. Ct. No. 2-01-CV-785-TC)**

---

Mark C. McLachlan (Kenneth B. Grimes, with him on the briefs), Mark C. McLachlan & Assoc., LC, Salt Lake City, Utah, appearing for Plaintiff-Appellant.

Matthew M. Durham (Justin B. Palmer, with him on the brief), Stoel Rives LLP, Salt Lake City, Utah, appearing for Defendant-Appellee.

---

Before **TACHA**, Chief Circuit Judge, **BALDOCK**, and **HENRY**, Circuit Judges.

---

**TACHA**, Chief Circuit Judge.

---

Plaintiff-Appellant Diane D. Dick sued her employer, Defendant-Appellee

Phone Directories Company, Inc. ("PDC"), alleging hostile work environment

same-sex discrimination and retaliation under Title VII of the Civil Rights Act of 1964. The District Court granted summary judgment in favor of PDC on all claims, reasoning that Ms. Dick was not discriminated against "because of sex" and that she had not suffered an adverse employment action. On appeal, Ms. Dick argues that there is a genuine issue of material fact regarding whether she was harassed because of her sex and whether the actions of her supervisor and her coworkers constitutes an adverse employment action. We take jurisdiction under 28 U.S.C. § 1291, AFFIRM in part, and REVERSE in part.

## I. BACKGROUND

In 1997, Ms. Dick began working as one of approximately eight sales representatives in PDC's Vernal, Utah office. She quickly became a top representative in Utah, earning various awards and trips for her sales. Sometime in 2000, Ms. Dick's direct supervisor was fired. Subsequently, Ms. Dick began to use her former supervisor's office, which apparently angered at least one coworker. In September 2000, PDC hired Laura Bills as the Vernal office manager and Ms. Dick's immediate supervisor. Ms. Dick alleges that Ms. Bills and her coworkers began to sexually harass her the following month, and that the conduct lasted until about May 2001. Nonetheless, Ms. Dick continued to be a successful sales representative and, at the time of this appeal, was still employed at PDC's Vernal office.

Ms. Dick describes the alleged harassment in terms of "a working environment permeated by sexually explicit banter, insults, lewd jokes, gestures, games, and devices." *Dick v. Phone Directories Company, Inc.*, 265 F. Supp. 2d 1274, 1275 (D. Utah 2003). PDC's Vernal office consists primarily of women; only two men worked there during the relevant time period. Three female coworkers and Ms. Bills took part in the conduct. Camie Hinkle, a coworker with no supervisory authority over Ms. Dick, appears to have taken the most prominent role in the harassment, so we begin with Ms. Dick's allegations about her conduct.[1]

Ms. Hinkle would approach Ms. Bills and another coworker from behind and make sexual gestures with her body toward them, although whether this involved physical contact is unclear. At one point, she put her foot in Ms. Bills' lap and said, "Yo, buff b*tch. How does that feel? Yo, buff b*tch. You like that." On other occasions, she would pinch Ms. Bills' breast and buttocks. She also is alleged to have hung a replica of a penis from the ceiling and to have brought a pillow to the office that she would kneel on while referring to oral sex with a man. The only behavior Ms. Hinkle specifically directed toward Ms. Dick,

---

[1]We note that, at times, the allegations in sexual harassment claims are better summarized for the sake of brevity and dignity. *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 77 (1998). In this case, however, the specific facts are necessary to our analysis; thus, we lay them out accordingly.

however, appears to be that twice Ms. Hinkle attempted to pinch Ms. Dick's breasts but Ms. Dick told her to get away from her, and that once at a novelty shop over the lunch hour Ms. Hinkle shoved a sex toy in the shape of a penis toward Ms. Dick.

The other alleged harassers are Ms. Bills, Dee Coleman, and Andrea Snow. Ms. Dick alleges that Ms. Bills often would tell coworkers "f*ck you" and should have taken greater steps to stop the harassing conduct of the other women in the office. Ms. Coleman often would point to Ms. Dick's collection of stuffed cats on her desk and say that Ms. Dick had a "pussy." Ms. Coleman also would kneel on the pillow brought by Ms. Hinkle and make similar references to oral sex. Ms. Snow would bend over her desk while she was not wearing underwear, also used the pillow while making oral sex references, and questioned Ms. Dick about a sex toy apparently used by lesbians. Ms. Dick also alleges that she was often called "Ivanna Dick" and "Granny Dick," that some of the women would simulate sex with a stuffed bear, and that vulgar rap music was often played in the office.

Ms. Dick also makes many separate allegations regarding the sexual orientation of the above women, but most of them constitute inadmissible hearsay which we address below. She properly alleges, however, that the office bulletin board was decorated in rainbow colors—which symbolizes gay pride—and that she witnessed Ms. Bills and an openly gay coworker, Teena Northern, lock

themselves into various rooms at the office for extended periods of time. Ms. Dick's granddaughter often babysat for Ms. Northern's children, but after learning that Ms. Northern was homosexual, Ms. Dick testified that "I wasn't upset that [PDC] hired a lesbian. I was upset that nobody told me so that I could make a decision about my granddaughter."

In November and December 2000, Ms. Dick complained to Ms. Bills about the office environment. Ms. Bills allegedly said, "[t]his is going to be a fun office" and ignored her complaints. Subsequently, Ms. Dick claims that Ms. Bills and her coworkers retaliated against her. These acts of retaliation are not specifically enumerated but appear to include increased hostility by coworkers, being "written up" by Ms. Bills over a disagreement with a coworker, and the circulation of an office memo instructing employees to refrain from using "foul language," "personal gestures," and being "loud and obnoxious." Moreover, at one point, Ms. Dick alleges that Ms. Bills threatened to fire her if she complained to Ms. Bills' supervisor, Jason Davis. This threat was never carried out.

Then, in March 2001, Ms. Dick filed a charge of discrimination with the Utah Anti-Discrimination Division. The following month, Ms. Dick, Ms. Hinkle, and Ms. Coleman had a dispute outside the office. Ms. Dick, who lives across the street from Ms. Hinkle, saw Ms. Coleman's car pull into Ms. Hinkle's driveway. Because Ms. Coleman and Ms. Hinkle were not friends, Ms. Dick thought the two

women were meeting together to talk about her. The next day, at seven in the morning, Ms. Dick went inside Ms. Coleman's home and confronted her. Ms. Coleman was angry with Ms. Dick for being in her home and later allegedly sent her the following unsigned e-mail:

> As far as I'm concerned where I go is my business and how long im [sic] there is my business, and I don't ever want to see u [sic] driving by my house watching me and don't ever walk into my home again! . . . No one hates you or is trying to get you fired, we don't understand whats goin thru [sic] your head. But anyway, this all stops here . . . don't try to pull anymore sh*t, we are not going to put up with it, we are a team and we must all get along.

After receiving the e-mail, Ms. Dick phoned the home of another coworker, Dee Dee York, but did not reach her. Ms. Dick then phoned Ms. York's mother's home but was still unable to contact Ms. York. Ms. York and Ms. Coleman then complained to Mr. Davis about Ms. Dick's conduct. He told them that the issue was not within his "jurisdiction" and that they should call "who they felt would help them." It is unclear whether Mr. Davis instructed the women to contact the police, but the women did do so. Thereafter, a police report was filed, but no charges were brought against Ms. Dick.

Ms. Dick filed this complaint against PDC in October 2001, alleging Title VII claims for hostile work environment same-sex discrimination, *see* 42 U.S.C. § 2000e-2, and retaliation, *see* 42 U.S.C. § 2000e-3, and for negligent employment of harassers under state law, *see Retherford v. AT & T*

-6-

*Communications of Mountain States, Inc.*, 844 P.2d 949, 967 (Utah 1992). The

District Court granted summary judgment in favor of PDC on both Title VII

claims. In dismissing the hostile work environment claim, the court held that Ms.

Dick had not shown that the harassment was because of her sex. As to her

retaliation claim, the court held that Ms. Dick had not shown an adverse

employment action. It then refused to exercise supplemental jurisdiction over the

negligent employment claim. *See* 28 U.S.C. § 1367(c)(3). Ms. Dick now timely

appeals the District Court's order granting summary judgment on her hostile work

environment and retaliation claims.[2]

## II. STANDARD OF REVIEW

We review the District Court's "grant of summary judgment de novo,

applying the same standards used by the district court." *Byers v. City of

Albuquerque*, 150 F.3d 1271, 1274 (10th Cir. 1998). Summary judgment is

appropriate "if the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits, if any, show that there is no

genuine issue as to any material fact and that the moving party is entitled to a

judgment as a matter of law." Fed. R. Civ. P. 56(c). We view the evidence, and

draw reasonable inferences therefrom, in the light most favorable to the

---

[2]Because Ms. Dick does not raise her state law claim on appeal, it is
waived. *Powers v. Harris* , 379 F.3d 1208, 1214 n.11 (10th Cir. 2004).

nonmoving party. *Byers*, 150 F.3d at 1274.

### III. DISCUSSION

A.      Hostile Work Environment

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). This statutory provision prohibits subjecting an employee to a hostile work environment. *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 65 (1986). "To establish a sexually hostile work environment existed, a plaintiff must prove the following elements: (1) she is a member of a protected group; (2) she was subject to unwelcome harassment; (3) the harassment was based on sex; and (4) [due to the harassment's severity or pervasiveness], the harassment altered a term, condition, or privilege of the plaintiff's employment and created an abusive working environment." *Seymore v. Shawver & Sons, Inc.*, 111 F.3d 794, 797, 798 (10th Cir. 1997). The first and second elements of the claim are not in contention, and the District Court did not reach the fourth. Therefore, we focus our discussion on the third element of the claim—whether Ms. Dick was discriminated against because of her sex.

In *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 79–80 (1998), the Supreme Court held that both opposite-sex and same-sex sexual harassment is

actionable under Title VII, but that such harassment violates Title VII only when it is "because of sex." The term "sex" under Title VII refers to a class delineated by gender. *Taken v. Oklahoma Corp. Comm'n*, 125 F.3d 1366, 1369 (10th Cir. 1997). Thus, even for same-sex sexual harassment claims, "[i]f the nature of an employee's environment, however unpleasant, is not due to her gender, she has not been the victim of sex discrimination as a result of that environment." *Stahl v. Sun Microsystems, Inc.*, 19 F.3d 533, 538 (10th Cir. 1994). Therefore, workplace harassment is not "automatically discrimination because of sex merely because the words used have sexual content or connotations." *Oncale*, 523 U.S. at 80. Indeed, Title VII is not "a general civility code for the American workplace." *Id.* Rather, the critical issue in determining whether harassment is because of sex is whether members of one sex are subjected to a disadvantage to which the other sex is not. *Id.*

After recognizing a cause of action for same-sex sexual harassment, the *Oncale* Court laid out three evidentiary routes in which an inference of discrimination because of sex can be drawn in the hostile work environment context.[3] *Id.* at 80–81. First, the Court held that the inference is "easy to draw"

---

[3]The relevant portion of the Court's opinion reads in full:

Courts and juries have found the inference of discrimination easy to draw in most male-female sexual harassment situations, because the

(continued...)

-9-

if the harasser and the harassed employee are of opposite sexes, at least when the conduct at issue involves "explicit or implicit proposals of sexual activity"; in that setting, "it is reasonable to assume those proposals would not have been made to someone of the same sex." *Id*. at 80. This same inference can be drawn where the persons involved are of the same sex "if there [is] credible evidence that the harasser [is] homosexual." *Id*. The Court was quick to point out, however, that "harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex." *Id*. Hence, the inference of discrimination because of sex may be found a second way, such as when a woman harasses another woman "in such sex-specific and derogatory terms . . . as to make it clear that the harasser is motivated by general hostility to

---

[3](...continued)
challenged conduct typically involves explicit or implicit proposals of sexual activity; it is reasonable to assume those proposals would not have been made to someone of the same sex. The same chain of inference would be available to a plaintiff alleging same-sex harassment, if there were credible evidence that the harasser was homosexual. But harassing conduct need not be motivated by sexual desire to support an inference of discrimination on the basis of sex. A trier of fact might reasonably find such discrimination, for example, if a female victim is harassed in such sex-specific and derogatory terms by another woman as to make it clear that the harasser is motivated by general hostility to the presence of women in the workplace. A same-sex harassment plaintiff may also, of course, offer direct com-parative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace.

*Id.* at 80–81.

the presence of women in the workplace." *Id.* Sex discrimination may be inferred yet a third way—when the plaintiff offers proof that the harasser treats men and women differently in the workplace. *Id.* at 80–81. The Court concluded that "[w]hatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimina[tion] . . . because of . . . sex.'" *Id.* at 81 (emphasis omitted). Ms. Dick relies primarily on the first route, making this a case of first impression for this Court.[4]

At first blush, it might appear that the crucial component of the first evidentiary route is that the victim put on "evidence that the harasser [is] homosexual." *Id.* at 80. Indeed, some courts have so held. *See Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1010 (7th Cir. 1999) (evidence tending to show that the defendant is sexually oriented toward members of the same sex leads to inference that the harassment is because of sex). Other courts require the victim to show that the harasser was "motivated by sexual desire." *See Bibby v. Philadelphia Coca Cola Bottling Co.*, 260 F.3d 257, 264 (3d Cir. 2001) (requiring

---

[4]Ms. Dick also argues her discrimination was "because of sex" under *Oncale*'s third evidentiary route; that is, she argues that her harassers treated men and women differently in the workplace. *See Oncale*, 523 U.S. at 80–81; *see also Chavez v. Thomas & Betts Corp.*, __ F.3d __, __, 2005 WL 139155, *3–4 (10th Cir. Jan. 24, 2005). We need not discuss *Oncale*'s third evidentiary route because we hold Ms. Dick has satisfied *Oncale*'s first evidentiary route. A jury, however, is certainly free to consider such evidence at trial.

evidence that the harasser sexually desires the victim). Still others appear to blend both approaches. *See La Day v. Catalyst Tech., Inc.*, 302 F.3d 474, 478 (5th Cir. 2002) (requiring evidence that the harasser is homosexual and that the harassment was an explicit or implicit proposal for sexual activity). Faced with no direction from this Court, the District Court concluded that a showing of both homosexuality and sexual motivation was required. *Dick*, 265 F. Supp. 2d at 1277–78. We now speak to the issue, however, and hold that *Oncale*'s first evidentiary route regarding whether same-sex harassment is because of the victim's sex hinges on whether the harasser's conduct is motivated by sexual desire. *Oncale*, 523 U.S. at 80.

To begin, *Oncale*'s first evidentiary route clearly encompasses conduct that is motivated by sexual desire because the Court prefaces its discussion of the second and third evidentiary routes by noting that, in contrast to the first evidentiary route, the second two routes do not require evidence that the harassing conduct was "motivated by sexual desire." *Id.* It directly follows, then, that the Court considered conduct that was motivated by sexual desire to meet the requirements under the first evidentiary route.

*Oncale* also suggests one way to establish that harassing conduct between members of the same sex is motivated by sexual desire. The Court indicated that conduct between members of the opposite sex that can be characterized as

"explicit or implicit proposals of sexual activity" will support a finding that the harasser was motivated by sexual desire—and, therefore, that the conduct took place as a result of the victim's sex. *Id.* The Court then went on to surmise that the same type of conduct between members of the same sex could also be found to be motivated by sexual desire, at least when the harasser is homosexual. *Id.* Thus, we hold that under *Oncale*, one way, but by no means the only way, a plaintiff in a same-sex sexual harassment suit may demonstrate that the harassing conduct was motivated by sexual desire, and therefore occurred because of her sex, is to establish both that the harassing conduct constitutes an explicit or implicit proposal for sexual activity and that her harasser is homosexual.

But a plaintiff need not, in every first-evidentiary-route case, establish that her harasser is homosexual in order to demonstrate that the harassing conduct was motivated by sexual desire. First, the text of *Oncale* does not limit the first evidentiary route only to the situation described above. Second, we note the possibility that an alleged harasser may consider herself "heterosexual" but nonetheless propose or desire sexual activity with another woman in a harassing manner. In that scenario, evidence of homosexuality beyond that of her conduct itself may not be forthcoming, although the harasser still acted out of sexual desire. Indeed, aside from testimonial evidence or the fact of the harassing conduct, we find it would often be extremely difficult to obtain evidence tending

to show a person's sexual orientation. Therefore, while the fact that the harasser is homosexual may support a finding that her conduct was motivated by sexual desire, we do not read *Oncale* to require a plaintiff to demonstrate, in every first-evidentiary-route case, such a fact. We emphasize that *Oncale*'s first evidentiary route turns on whether the harasser acted out of sexual desire. A plaintiff who makes this showing establishes that the harassment took place because of her sex, regardless whether she has also demonstrated that her harasser is homosexual.

We turn now to Ms. Dick's allegations to determine whether there is a genuine issue of material fact as to whether Ms. Dick's harassers were motivated by sexual desire. In granting summary judgment in favor of PDC, the District Court relied in large part on evidence tending to show that Ms. Hinkle, Ms. Bills, Ms. Coleman, and Ms. Snow harassed Ms. Dick because they did not like her and wanted to humiliate her—not because they were motivated by sexual desire. *See LaDay*, 302 F.3d at 480 ("evidence suggesting that the harasser intended to have some kind of sexual contact with the plaintiff . . . [only] to humiliate [her] for reasons unrelated to sexual interest" does not satisfy the first evidentiary route outlined in *Oncale*).

In support of its finding, the District Court pointed out that Ms. Dick admitted in her own deposition that she felt Ms. Hinkle harassed her in order to aggravate and annoy her and that she is unsure what Ms. Hinkle's sexual

-14-

intentions were. As to the other harassers and other types of conduct, Ms. Dick states in her deposition that "[t]hey knew I didn't like stuff like that. They constantly would do things like that to upset me. They just thought it was hilarious." Other facts in the record further support the inference that Ms. Dick was not well-liked by her coworkers at PDC and was harassed for this reason. First, Ms. Dick was consistently a top salesperson, receiving substantial awards for her work achievements. Second, Ms. Dick expressed concern that her granddaughter was babysitting the children of an openly gay coworker. Third, after Ms. Bills' predecessor left PDC but prior to Ms. Bills' arrival, Ms. Dick assumed the role of supervisor without authorization from management—conduct that was not well-received by at least one coworker. Fourth, the e-mail allegedly sent by Ms. Coleman indicates Ms. Dick's coworkers thought she was a busybody. Thus, we agree with the District Court that the harassment of which Ms. Dick complains—harassment that is most often expressed by unprofessional conduct, foul-mouthed attempts at humor, and crude puns on Ms. Dick's last name—could be viewed as an attempt to humiliate Ms. Dick rather than as conduct that was motivated by sexual desire.

Nonetheless, we cannot agree that, as a matter of law, Ms. Dick was harassed out of sheer dislike. The record contains sufficient evidence from which a jury could find that her harrasers' conduct was motivated by sexual desire. Ms.

Hinkle touched, on more than one occasion, one of the most intimate parts of Ms. Dick's body—an act seldom carried out without some sort of sexual motivation. Second, Ms. Hinkle and Ms. Bills engaged in same-sex sexual conduct with other people in the workplace. *See La Day*, 302 F.3d at 480 (evidence showing that harasser made same-sex sexual advances to others in the workplace suggests that the conduct directed toward the plaintiff resulted from sexual interest). Here, Ms. Hinkle allegedly rubbed Ms. Bills' crotch while asking Ms. Bills if she liked it. Ms. Dick also alleges that Ms. Bills locked herself in a room at the office with an openly gay coworker, which a jury might find indicates Ms. Bills tolerates sexually motivated conduct in the workplace. Finally, while the shoving of a sex toy into Ms. Dick's face could be viewed as an immature pun on her last name, we do not think that the record mandates this finding.[5]

---

[5]Ms. Dick also makes a variety of allegations about her coworkers' sexual orientation in support of her hostile work environment claim. The District Court excluded these allegations as inadmissible hearsay, however, and we agree. *See Starr v. Pearle Vision, Inc.*, 54 F.3d 1548, 1555 (10th Cir. 1995) (holding that Rule 56 precludes the use of inadmissible hearsay in depositions submitted in support of, or in opposition to, summary judgment). Ms. Dick specifically appeals the District Court's exclusion of (1) testimony by a coworker, Jackie Ivie, that Ms. Coleman told her that she (Ms. Coleman) was homosexual, and (2) statements that the office was known as the "lesbian factory." She argues the first statement is admissible as a party-opponent admission, *see* F.R.E. 801(d)(2), but we hold that it is not a party admission because it does not concern a matter within the scope of Ms. Coleman's employment with PDC, *see* F.R.E. 801(d)(2)(D). Ms. Dick argues the second statement is admissible as concerning the reputation of a person's character, *see* F.R.E. 803(21), but we hold that this

(continued...)

Given these facts, as well as Ms. Dick's other allegations concerning the conduct to which she was subjected, we conclude that the record contains evidence sufficient for the trier of fact to find that the harassing conduct was motivated by sexual desire. As such, there is a genuine issue of material fact as to whether the alleged harassers' conduct toward Ms. Dick occurred because of her sex.

We emphasize, however, that not every sexual comment or gesture between members of the same sex, including those made by the Defendants here, that might be motivated by sexual desire or construed as a sexual proposal is actionable under Title VII. *Oncale* counsels against such a conclusion, explaining that conduct that is because of sex will only be actionable when it is "'severe or pervasive to create an objectively hostile or abusive work environment.'" *Oncale*, 523 U.S. at 81 (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)). This requirement is "crucial," *id.*, and prevents "ordinary socializing in the workplace—such as male-on-male horseplay or intersexual flirtation" from becoming prohibited sexual discrimination. *Id.* Indeed, the Court explained that in all sexual harassment cases, the question of whether conduct is sufficiently

---

[5](...continued)
statement is not admissible under that Rule because the statement concerns neither a person nor her character. The District Court was correct not to consider the statements.

severe or pervasive "requires a careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Id.* The Court concluded that such consideration "will enable courts and juries to distinguish between simple teasing or roughhousing among members of the same sex" and conduct that is severely hostile or abusive. *Id.*

In the case before us, however, the District Court did not reach the issue of whether the alleged harassment was sufficiently severe or pervasive to be actionable under Title VII. Therefore, while we reverse the District Court's entry of summary judgment based on its determination that Ms. Dick was not subjected to harassment because of her sex, we remand for a determination as to whether the harassment was sufficiently severe or pervasive to create an abusive work environment.

## B.   Retaliation

Ms. Dick next contends that she was retaliated against for complaining to Ms. Bills and the Utah Anti-Discrimination Division. Ms. Dick alleges that Ms. Bills threatened to fire her if she complained to Mr. Davis, her supervisor, about the workplace environment; nevertheless, Ms. Dick has not been fired. She further asserts that coworkers were hostile to her in the office, that Mr. Davis encouraged coworkers to file a police report against her, that Ms. Bills distributed an interoffice memo outlining and prohibiting inappropriate office behavior, and

that Ms. Bills issued her a "write-up."

Title VII makes it an unlawful employment practice for an employer "to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by this subchapter[.]" 42 U.S.C. § 2000e-3(a). In order to establish a prima facie case of retaliation, Ms. Dick must show (1) she engaged in protected opposition to discrimination; (2) PDC took an adverse employment action against her; and (3) a causal connection between the protected activity and the adverse action. *Jeffries v. Kansas*, 147 F.3d 1220, 1231 (10th Cir. 1998). Ms. Dick may maintain an action for retaliation even though the conduct forming the basis of her underlying complaint was not adjudged to have violated Title VII. *Id.*

The parties agree that Ms. Dick satisfies the first prong of the prima facie case. *See Hertz v. Luzenac America, Inc.*, 370 F.3d 1014, 1015 (10th Cir. 2004) ("Protected opposition can range from filing formal charges to voicing informal complaints to superiors."). The parties dispute, however, whether the alleged retaliatory acts constitute adverse employment actions and whether they are the result of Ms. Dick's complaints. The District Court concluded that none of the incidents constitutes an adverse employment action and granted summary judgment in favor of PDC as a matter of law. On appeal, Ms. Dick gives short shrift to her retaliation claim, raising these five alleged instances of retaliation in

-19-

only two pages of her opening brief. We note that "[w]e will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim, particularly when, as here, a host of other issues are presented for review." *Craven v. Univ. of Colo. Hosp. Auth.*, 260 F.3d 1218, 1226 (10th Cir. 2001) (internal quotation omitted). We begin with the unrealized threat of termination.

1. *Unrealized Threat of Termination Contingent Upon Engaging in Protected Title VII Activity*

An adverse employment action includes acts that "'constitute[] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Sanchez v. Denver Pub. Schs.*, 164 F.3d 527, 532 (10th Cir. 1998) (quoting *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998)). In our recent decision of *Hillig v. Rumsfeld*, 381 F.3d 1028, 1033 (10th Cir. 2004), however, we expressly held that an adverse employment action is not limited to such acts. Rather, we liberally interpret the second prong of the prima facie case and take a case-by-case approach, examining the "'unique factors relevant to the situation at hand.'" *Id.*; *see also Stinnett v. Safeway, Inc.*, 337 F.3d 1213, 1217 (10th Cir. 2003). Nevertheless, "we will not consider 'a mere inconvenience or an alteration of job responsibilities' to be an adverse employment action." *Sanchez*, 164 F.3d at 532.

On appeal, Ms. Dick does not argue that her unrealized termination falls

within one of the four scenarios outlined in *Sanchez*, nor does she argue that the threat constitutes an adverse employment action under *Hillig*. Further, she does not argue the District Court erred in relying on *Jeffries v. State of Kansas*, 147 F.3d 1220 (10th Cir. 1998), and *Cole v. Ruidoso Municipal Schools*, 43 F.3d 1373 (10th Cir. 1994), to hold that the threat was not an adverse employment action. Rather, she merely asserts the District Court failed to address the "threats of termination from her supervisor . . . . in light of the record as a whole, or to consider them in the context of Dick's retaliatory harassment claim." This curious assertion is unsupported by the record.

Here, the District Court relied on the fact that we have never expressly held that an unrealized threat of termination, without more, constitutes an adverse employment action. For example, in *Jeffries*, a resident chaplain and student at a state hospital filed a formal sexual harassment complaint against a coworker. 147 F.3d at 1226. After learning of the complaint, the student's supervisor told her that he would no longer supervise her as a student and that he would not renew her contract of employment. *Id.* at 1232. The student, however, quit before her contract had to be renewed. *Id.* at 1228. While we ultimately found an adverse employment action on other grounds, *id.* at 1232–33, we intimated that if certain special circumstances exist, such as a unique interpersonal or educational relationship between the supervisor and employee, an unrealized threat of

termination may constitute an adverse employment action. *Id.* at 1232. Relying on this decision, the District Court held that Ms. Bills' alleged threat was not an adverse employment action because Ms. Dick and Ms. Bill did not have the unique type of relationship present in that case. *Dick*, 265 F. Supp. 2d at 1288.

The District Court also held that the alleged threat was not an adverse employment action because it was never carried out. It relied on *Cole,* in which we held that a principal's statement, made after a teacher had filed a charge of discrimination with the EEOC, that the teacher's performance would be evaluated more often than other teachers of the same experience level was not an adverse employment action because "there was no suggestion that the requirement was ever adopted or carried out." *Cole*, 43 F.3d at 1381. The District Court found this reasoning persuasive in this context because Ms. Bills never carried through with her threat. Given the District Court's thorough analysis of the entire record in light of our case law, Ms. Dick's bare assertion that the District Court failed to consider her claim "in light of the record as a whole, or to consider them in the context of Dick's retaliatory harassment claim[]" is without merit.

2. *Coworker Hostility*

Coworker hostility or retaliatory harassment may be an "adverse employment action" if it is sufficiently severe. *Gunnell v. Utah Valley State Coll.*, 152 F.3d 1253, 1264 (10th Cir. 1998). Assuming arguendo that the

hostility of which Ms. Dick complains rises to this actionable level, Ms. Dick has nonetheless failed to establish a genuine issue as to whether that hostility resulted from her complaints.

In a single paragraph on appeal, Ms. Dick argues only "that every time [I] complained, [I] was retaliated against," citing her deposition testimony that "[e]very time I would complain, I would get the same results." We note that a causal connection may be established by showing "evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Burrus v. United Tele. Co., Inc*., 683 F.2d 339, 343 (10th Cir. 1982). Ms. Dick, however, does not make this argument on appeal; indeed, she does not cite any legal authority relating to the causation element. In fact, Ms. Dick never even so much as mentions this crucial component of a retaliation cause of action. As such, we agree with the District Court that PDC is entitled to summary judgment on this claim.

3. *Filing a Police Report*

Filing false criminal charges against, or the malicious prosecution of, an employee can constitute an adverse employment action. *Berry v. Stevinson Chevrolet*, 74 F.3d 980, 986 (10th Cir. 1996). Ms. Dick alleges that Mr. Davis instructed Ms. Dick's coworkers to file a police report against her in retaliation for bringing claims of harassment and that this constitutes an adverse employment

action.  We agree with the reasoning of the District Court and hold that the police report in this case is not an adverse employment action.

In *Berry*, there was evidence that the employee's former supervisor "caused individuals to report [a crime]." *Id.*  We noted that criminal prosecution involving a public criminal trial would have "an obvious impact" on the employee's "future employment prospects." *Id.*  Unlike the plaintiff in *Berry*, however, Ms. Dick has not stood trial, and no formal charges have been brought against her.  Rather, her coworkers simply complained to the Vernal police, allegedly at Mr. Davis's suggestion, which resulted in a police report.  There is no evidence that the matter persisted beyond the filing of the report.  Unlike the public criminal trial to which the plaintiff in *Berry* was subjected, the police report describing alleged incidents involving Ms. Dick does not "carr[y] a significant risk of humiliation, damage to reputation, and a concomitant harm to future employment prospects." *Id.*  Accordingly, the police report in this context cannot be considered an adverse employment action.

4.	*Circulation of a "Do's and Don't's Memo"*

Ms. Dick alleges that Ms. Bills' circulation of a "Do's and Don't's Memo" admonishing employees not to be "loud and obnoxious in the office," not to "share personal gestures (such as Burps, Farts, Etc.)," and not to use "foul language" was in retaliation for her complaints because the memorandum was

-24-

meant to "stir things up."  We agree with the District Court that because Title VII imposes a duty on an employer to reasonably investigate and address a plaintiff's complaints, a finding that such a memorandum is actionable retaliatory conduct would produce an absurd result.  *Dick*, 265 F. Supp. 2d at 1287.  The memorandum reflected PDC's attempt to bring positive changes to the office.  Ms. Dick's bare assertion of a contrary motivation is not sufficient to create a genuine issue of material fact on this issue.

5.     *Issuance of a "Write-Up"*

Ms. Dick maintains that a further example of an adverse employment action was the disciplinary action taken against her when she was "written up" for "making negative remarks about co-workers" immediately following a verbal altercation with Jackie Ivie (who was also written up).  We have indicated that disciplinary action on the part of an employer can constitute adverse employment action.  *See Roberts v. Roadway Express, Inc.*, 149 F.3d 1098, 1104 (10th Cir. 1998); *Marx v. Schnuck Markets, Inc.*, 76 F.3d 324, 329 (10th Cir. 1996).  We agree with the District Court, however, that *Roberts* and *Marx* are distinguishable from the case before us.  *See Dick*, 265 F. Supp. 2d at 1288–89.

In *Roberts*, for example, the plaintiff received twenty warning letters, two suspensions, and a termination, all within two years of his complaint.  The record also showed that the more warnings the plaintiff received, the more likely he

would be terminated—in other words, the disciplinary actions had a direct bearing on his future employment. *Roberts*, 149 F.3d at 1104. And in *Marx*, the write-up was only the first act taken by the employer that ultimately culminated in the plaintiff's termination. *Marx*, 76 F.3d at 329. In contrast, Ms. Dick alleges only one instance of a disciplinary action. Moreover, she does not allege that the single write-up has any bearing on her likelihood of being fired. On these facts, Ms. Dick has not demonstrated any harm to her future employment prospects. *See Hillig*, 381 F.3d at 1033. The single write-up is not an adverse employment action.

## IV. CONCLUSION

Therefore, we REVERSE the District Court's order of summary judgment in favor of PDC as to Ms. Dick's hostile work environment claim and AFFIRM its order of summary judgment in favor of PDC as to her retaliation claim.