FILED
United States Court of Appeals
Tenth Circuit

July 31, 2008

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

STEPHEN M. DEWALT,

      Plaintiff–Appellant,

v.

MEREDITH CORPORATION, doing
business as KCTV-5,

      Defendant–Appellee.

No. 07-3149
(D.C. No. 05-CV-2544-JWL)
(D. Kan.)

**ORDER AND JUDGMENT**[*]

Before **HENRY**, **TACHA**, and **LUCERO**, Circuit Judges.

Stephen M. DeWalt appeals from the grant of summary judgment in favor

of his former employer, Meredith Corporation, on his claims brought under the

Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621-634. The

district court concluded that it lacked jurisdiction over some of DeWalt's claims

because DeWalt had failed to file a timely administrative charge. As to DeWalt's

remaining allegations, it determined that he had failed to raise a genuine issue of

---

[*] This order and judgment is not binding precedent, except under the
doctrines of law of the case, res judicata, and collateral estoppel. This court
generally disfavors the citation of orders and judgments; nevertheless, an order
and judgment may be cited under the terms and conditions of 10th Cir. R. 32.1.

material fact indicating that he had been subjected to an adverse employment action or a hostile work environment. Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

**I**

**A**

DeWalt was born on September 10, 1950. From 1973 to 2004, he worked for KCTV-5 ("KCTV" or "Channel 5"), the CBS local affiliate in Kansas City, which was owned and operated by defendant-appellee Meredith Corporation ("Meredith"). For nearly 30 years, DeWalt served as a news photographer for the station. According to the union agreement governing his position, DeWalt's primary responsibilities included photographing news, weather, and sports material; setting up and operating lighting equipment for this purpose; and creative editing of such material. DeWalt's pay and vacation time were also determined by his membership in the union. During the last 10 years of his tenure at KCTV, DeWalt was at the top of the union pay scale.

Starting in the spring of 2002, KCTV News adopted a new theme for its programming: "Live. Late-Breaking. Investigative." This format change emphasized live, on-site reporting and required reporters and photographers to travel to a location, set up and deliver a live report, then break down all the equipment and move to the next location. As Terry Kurtright, KCTV's Newsroom Operations Manager, explained, "the pressure was enormous on all of

us." Kurtwright was DeWalt's immediate supervisor. Above Kurtwright was Assistant News Director Brenda Poor. News Director Rejean "Regent" Ducas was the ultimate supervisor of all employees in KCTV's news division.

DeWalt asserts that following the format change, senior management at KCTV began a concerted effort to force out older employees. DeWalt claims that he was among those targeted and cites several incidents in which he believes Meredith treated him in a discriminatory manner. These include (1) changing his shift, (2) denying him necessary training, (3) denying him vacation, and (4) issuing written and verbal reprimands. DeWalt also alleges that KCTV management harassed him and other older employees and made ageist comments, creating a hostile work environment. As a result of these discriminatory actions, DeWalt contends that he was effectively forced to quit.

For at least 15 years prior to the format change, DeWalt had worked the day shift, which ran from 9 a.m. to 5 p.m. In November 2002, however, DeWalt was moved to the night shift and assigned to work from 10 p.m. to 6 a.m. Approximately three months later, management changed DeWalt's shift again to 12 a.m. until 8 a.m. According to DeWalt, photographers with little experience usually worked overnight shifts, and he considered the move a demotion. As he explained in deposition, "you're not going to win a Peabody award working nights." DeWalt also claimed that working nights caused significant problems for his health and his family.

Kurtwright made the decision to move DeWalt to the night shift, with input from Poor and approval from Ducas. He explained in deposition that he thought DeWalt was a better fit for a night shift because DeWalt's skills in listening to police scanners and his knowledge of the Kansas City area meant that he could identify stories and get to a location with minimal supervision. Kurtwright also wanted to pair DeWalt with a less experienced night shift reporter, Eric Chaloux, so that Chaloux could learn more about the market. However, Chaloux did not begin working for KCTV until December 2002, a month after DeWalt had already been assigned to the 10 p.m. to 6 a.m. shift. Poor agreed that DeWalt's scanner skills and geographical knowledge made him a good fit for the night shift, and added that DeWalt was less skilled at editing, which was more important for day-shift photographers.

DeWalt alleges that he was denied training on a new brand of editing machines. According to DeWalt, KCTV switched to the Avid brand of editing equipment at some point prior to November 2002. He does not specify when he was denied training on the Avid equipment, but Meredith claims that KCTV offered Avid training to all editors and photographers in January 2003. DeWalt also alleges that he was only given an hour of training on a new type of live truck, which KCTV purchased around 2000 or 2001. Again, he does not state when he received this one-hour training session, but the record indicates that it occurred at

some point before October 4, 2002, when he experienced difficulty operating the truck despite having received training on it.

With respect to vacation time, DeWalt claims that he was denied five weeks of leave in 2003. That year he was entitled to a total of seven weeks vacation, two of which he used. At some point in the fall, he wrote a letter to Kurtwright, reminding Kurtwright that he still had five weeks of vacation left and asking if they could discuss when he might use his leave. Kurtwright never responded. Because vacation days do not carry over from year to year, DeWalt alleges that he lost this benefit by not taking his remaining vacation days in 2003. DeWalt did not provide a copy of his letter to Kurtwright, and he admits that he never submitted a formal vacation request for the remaining five weeks. He did, however, submit such a request for the two weeks he used in 2003.

From 2002 to 2004, DeWalt asserts that KCTV management subjected him to a series of written and verbal reprimands. The first written reprimand came in October 2002, when DeWalt was still working the day shift. On October 1, he misplaced a tape or forgot to place a tape in the recorder while he was covering an important trial. On October 4, DeWalt experienced difficulty operating the new truck to deliver a live shot. Although DeWalt had been trained on the truck by this time, he had little experience actually operating it and had difficulty finding the power switch for the truck's equipment. Another photographer on the scene also could not find the switch. Finally, they were able to contact a third

photographer who was experienced with the truck, and he helped them turn the power on and deliver the shot. During the confusion, DeWalt lost his cellular phone. Following these two events, DeWalt received a written reprimand from News Director Ducas on October 11. Although commending DeWalt's efforts in general, the memorandum stated that "you must pay closer attention to details and focus on your day-to-day assignments," citing the errors on October 1 and 4.

During 2003, DeWalt received three memoranda from Kurtwright. On January 22, Kurtwright chastised DeWalt for leaving the interior lights on in one of the trucks. On February 12, Kurtwright noted that a van last used by DeWalt was full of trash and smelled of cigarette smoke, and reminded him to clean out all trash when he was finished with a van. The third memorandum came on October 16, regarding the proper procedure for filing an equipment failure report. Apparently, DeWalt had left a note indicating that one of the trucks had "crapped out," without further explanation. DeWalt claims that a microphone had failed, and that the assistant chief engineer on duty that night told him simply to leave a note to that effect. None of these letters warned of further disciplinary action.

DeWalt received a verbal reprimand from Ducas in late January of 2004. According to Ducas, over the preceding weekend, Kurtwright had attempted to contact a number of reporters and photographers to cover a major snowstorm. On Monday, Kurtwright told Ducas that he had left a message with someone at DeWalt's home, but that DeWalt never called back. He added that only two

employees—DeWalt and another photographer—had failed to return his calls. Ducas called DeWalt and the other photographer, who was also over 40 years old, into his office, and reprimanded them for failing to return Kurtwright's call. According to DeWalt, Ducas told him that Kurtwright had left a message with his "son," but DeWalt does not have a son, and lives only with his wife and two daughters. After the reprimand, DeWalt checked the caller identification log on his home phone and spoke with his family members, but found no indication of a call from the station. DeWalt concluded that Ducas' criticism was "irrational." He also notes that his union informed members that they were not required to answer calls from work during their time off.

In addition to the actions managers took against him personally, DeWalt asserts that other employees over age 40 had similar experiences to his own, and that Meredith managers routinely treated older employees with disrespect. For example, several other experienced photographers and engineers were moved from day to night shifts, and some older employees reported that they were unfairly criticized, whereas younger employees were not. According to statistics compiled by DeWalt, after the institution of the new investigative format, 59% of KCTV employees ages 50 or over left or were terminated, and 44% of employees between the ages of 40 and 49 left or were terminated. This compares to only 27.5% of the total KCTV workforce who left or were terminated during the relevant period.

DeWalt also points to specific comments made by senior management indicating an ageist attitude. In June 2002, Kevin O'Brien, who at that point had recently become president of broadcasting for Meredith, held a video conference. DeWalt recalls that O'Brien "called us dinosaurs over at Channel 5" and "referred once to Old Meredith, which I would think would be the older employees." Shortly after this video conference, other employees told DeWalt about a meeting with Ducas. Ducas told them that Meredith's vice president of news had instructed him to "fire all the old reporters." Later, after his shift change, DeWalt asked Executive Producer Alvie Carter why he and others had been moved to an overnight shift. Carter replied, "because you guys are old."

As a result of the persistent mistreatment and the toll that working a night shift took on his personal life, DeWalt resigned from KCTV on February 8, 2004. At the time, he was 53 years old. In his letter of resignation, DeWalt cited "systematic harassment of employees with many years of service" as the reason for his leaving, but did not specify age discrimination. When a human resources representative contacted DeWalt after his resignation, DeWalt explained that he was concerned about "the harassment of older employees." Other than this comment, DeWalt never complained directly to Meredith or to his union about discrimination. DeWalt later explained that he did not complain to management because "they were the problem," and that they already knew of the discrimination through word of mouth, from union negotiations following

complaints by other employees, and from the high turnover rate among older employees. Although the record contains little evidence on this point, it appears that at least one employee over age 40, television director Stuart Lebow, filed grievances with the union, complained to management, and ultimately filed an age-based discrimination charge with the Equal Employment Opportunity Commission ("EEOC").

**B**

On April 30, 2004, DeWalt filed charges with the Kansas Human Rights Commission and the EEOC.[1] He received notice of his right to sue from the EEOC and filed a complaint in federal court, asserting two claims under the ADEA: an individual claim of age discrimination based on disparate treatment, disparate impact, and hostile work environment theories;[2] and a claim that he and others similarly situated were subjected to a pattern and practice of discriminatory treatment. He later moved to consolidate his case with that of Lebow, who had also filed an age-discrimination suit against KCTV. Meredith opposed consolidation and moved for summary judgment.

---

[1] The filing date on the copy of DeWalt's EEOC charge in the record is illegible. DeWalt "presumes" that his EEOC and Kansas state charges were filed on the same day, and Meredith concedes that the EEOC charge was filed on April 30, 2004. We will therefore assume that his EEOC charge was filed on that date.

[2] DeWalt later abandoned his claim that Meredith's conduct disparately impacted older employees.

The district court granted summary judgment to Meredith and dismissed the motion for consolidation as moot. First, it determined that it only had jurisdiction over claims arising out of actions taken no more than 300 days prior to the filing of DeWalt's EEOC charge.[3] See Shikles v. Sprint/United Mgmt. Co., 426 F.3d 1304, 1317 (10th Cir. 2005); Haynes v. Level 3 Commc'ns, LLC, 456 F.3d 1215, 1222 (10th Cir. 2006). Because DeWalt filed his charge at the end of April 2004, the court found that this charge was untimely as to his claims regarding actions occurring before the end of June 2003, including the shift changes and denials of training.[4] It also concluded that DeWalt could not "piggyback" on Lebow's 2003 EEOC complaint under the single-filing rule for coplaintiffs in certain types of discrimination cases. See Foster v. Ruhrpumpen, Inc., 365 F.3d 1191, 1196-97 (10th Cir. 2004). Accordingly, the court dismissed DeWalt's claims of disparate treatment based on these incidents.

Applying the framework from McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973), the court addressed the incidents that were not time-barred: denial of vacation and reprimands. It found that these did not constitute adverse employment actions as defined in our caselaw. The court also concluded

---

[3] Although the parties had only discussed this issue in footnotes in their pleadings, the court noted that it had an independent duty to satisfy itself of proper jurisdiction.

[4] The court incorrectly calculated the limitations period starting from April 23, 2004, which was the date on which DeWalt signed his complaint, rather than from April 30, 2004, the date on which his complaint was filed.

that DeWalt had not demonstrated that he was constructively discharged. Thus, he had failed to meet his burden of showing an adverse employment action, and his disparate treatment claim failed. As for DeWalt's hostile work environment claim, the court considered evidence of harassment dating back to 2002, and concluded that it fell short of establishing the requisite hostility to sustain the claim. DeWalt appeals, contesting the district court's determination that he failed to establish a prima facie case of either disparate treatment or a hostile work environment based on age.[5]

## II

### A

We begin by addressing the district court's conclusion that it lacked jurisdiction over some aspects of DeWalt's claims because his EEOC charge was untimely. We review the dismissal for lack of jurisdiction de novo. Montoya v. Chao, 296 F.3d 952, 954-55 (10th Cir. 2002). In this case, the district court incorrectly determined that the timeliness of DeWalt's EEOC charge was jurisdictional, as opposed to an affirmative defense, but we deem the error harmless.

Under the ADEA, DeWalt was required to file a charge with the EEOC within 300 days of Meredith's adverse actions against him. 29 U.S.C. §§ 626(d),

---

[5] DeWalt does not challenge the district court's grant of summary judgment to Meredith on his pattern-or-practice claim.

633(b); see also Proctor v. United Parcel Serv., 502 F.3d 1200, 1204, 1206 n.3 (10th Cir. 2007) (applying 300-day limitations period because Kansas has an agency empowered to investigate employment discrimination and the employee filed a charge with that agency). Consequently, DeWalt's EEOC charge, filed on April 30, 2004, is timely only with respect to actions taken on July 5, 2003, or after. See Nat'l R.R. Passengers Corp. v. Morgan, 536 U.S. 101, 110 (2002) (plaintiff must file an EEOC charge within 300 days of the date of each discrete act of discrimination or "lose the ability to recover for it").

The district court found that DeWalt's EEOC charge was not timely as to the shift changes and denials of training. It characterized this untimeliness as a failure to exhaust administrative remedies, and concluded that it lacked jurisdiction to consider these earlier adverse actions. Failure to exhaust administrative remedies—such as a refusal to cooperate with an EEOC investigation—is a jurisdictional bar to suit. See Shikles, 426 F.3d at 1317. But "the timely filing of a discrimination charge with the EEOC is not a jurisdictional prerequisite to a suit in federal court;" instead, "it is best likened to a statute of limitations . . . subject to waiver, estoppel and equitable tolling." Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1174-75 (10th Cir. 1998); see also Zipes v. Trans World Airlines, Inc., 455 U.S. 385, 393 (1982) (under Title VII, timely filing of an EEOC charge is not a jurisdictional prerequisite to suit); Shikles, 426 F.3d at 1309 ("To the extent that the charge filing requirements of the ADEA and

-12-

Title VII are similar, courts must construe them consistently."). Thus the district court erred in treating the timeliness of DeWalt's complaint as a jurisdictional issue, rather than as an affirmative defense to be raised by Meredith.

We may, however, disregard errors that "do not affect the substantial rights of the parties" and are therefore harmless. 28 U.S.C. § 2111; see also Fed. R. Civ. P. 61; Getter v. Wal-Mart Stores, Inc., 66 F.3d 1119, 1123 (10th Cir. 1995). DeWalt argues that the district court's error affected his substantial rights because, according to DeWalt, it raised the issue of timeliness sua sponte and thereby deprived him of the opportunity to present argument.[6] DeWalt is incorrect. Upon review of the record, we conclude that this issue was properly raised by Meredith and that DeWalt had a full opportunity to litigate it.[7] As such,

_____

[6] Unlike affirmative defenses, which may be waived by a party, a court has an independent duty to inquire into its subject-matter jurisdiction and may raise this issue sua sponte. See 1mage Software, Inc. v. Reynolds & Reynolds Co., 459 F.3d 1044, 1048 (10th Cir. 2006).

[7] In its answer to DeWalt's complaint, the pretrial order, and its motion for summary judgment, Meredith argued that DeWalt's claims related to the shift changes and lack of training were time-barred. DeWalt responded to this argument in his opposition to summary judgment. Thus Meredith did not waive the argument, and DeWalt actually had an opportunity to address it. Cf. Cortez v. Wal-Mart Stores, Inc., 460 F.3d 1268, 1276-77 (10th Cir. 2006) (issues not raised in the pretrial order are waived). DeWalt points out that in the motion for summary judgment and his response to the motion, the parties only discussed timeliness in footnotes, rather than the main text of the pleadings. But once an issue has been properly raised in the pretrial order, the location of its discussion in the pleadings is immaterial, merely reflecting the strategic choices of the parties in presenting their case.

DeWalt's contention that he was prevented from fully developing the record is likewise meritless. He asserts that he did not have a fair opportunity to

DeWalt's substantial rights were unaffected by the court's error. Moreover, because both parties briefed the issue in the court below as well as this court, we may properly address timeliness in the course of our de novo review. Cf. Smith v. Rogers Galvanizing Co., 128 F.3d 1380, 1386 (10th Cir. 1997) (restating the general rule that an appellate court will only consider nonjurisdictional issues if they are raised below).

**B**

Turning to Meredith's argument that some of DeWalt's claims are time-barred, we agree that his EEOC charge is untimely as to actions taken before July 5, 2003. See Morgan, 536 U.S. at 110. DeWalt counters that the single-filing rule, which allows a plaintiff to "piggyback" on the timely EEOC charge of a similarly situated coplaintiff, applies. See Thiessen v. Gen. Electric Capital Corp., 267 F.3d 1095, 1110 (10th Cir. 2001). He urges that we should consider

---

develop the factual record regarding the timeliness of his EEOC charge because the district court did not afford him an evidentiary hearing on this issue. Yet DeWalt did not request a hearing, nor did he seek to supplement the record. He attached evidentiary materials to his opposition motion, but none of these relate to timeliness. Moreover, Meredith first raised the timeliness defense in its answer, prior to discovery, and thus DeWalt could have requested discovery on the issue. Under the circumstances, we determine that DeWalt had a fair opportunity to develop the record.

Finally, we note that a party may raise a statute of limitations defense in a motion for summary judgment. See Hutchinson v. Pfeil, 105 F.3d 562, 564 (10th Cir. 1997) ("A defendant may use a motion for summary judgment to test an affirmative defense which entitles that party to a judgment as a matter of law.").

actions taken 300 days before August 2003, when he claims fellow employee Stuart Lebow filed his EEOC charge.

DeWalt has failed, however, to include a copy of Lebow's EEOC charge in the record.[8]  Without this document, we are unable to confirm whether Lebow filed a charge at all, and if so, whether he did so in August 2003—an assertion which Meredith contests.  Nor are we able to determine whether DeWalt and Lebow were similarly situated for purposes of the single filing rule.  Because DeWalt has not provided a record sufficient to allow review of his argument, we are unable to reach it on appeal.  See 10th Cir. R. 30.1(A)(1) & (3); Travelers Indem. Co. v. Accurate Autobody, Inc., 340 F.3d 1118, 1121 (10th Cir. 2003).  Consequently, the allegedly adverse incidents which occurred before July 5, 2003—specifically, the shift changes in November 2002 and January 2003, and the failure to train DeWalt on certain equipment before October 2002 and January 2003—are time-barred.[9]  We will consider DeWalt's remaining allegations of adverse action, however, either because they occurred on or after July 5, 2003 and

---

[8] In his appellate reply brief, DeWalt claims that "the Lebow Charge of Discrimination [is] attached hereto," but the brief does not include such an attachment.

[9] As noted above, the record indicates that he received truck training sometime before October 4, 2002.  Although DeWalt does not specify when he received Avid training, Meredith gives the date as January 2003, and DeWalt does not contest this assertion.

are therefore timely, or because their timeliness is not contested by Meredith.[10]  In the context of his hostile work environment claim, we consider all of DeWalt's allegations because some of the acts supporting his claim occurred during the statutory time period.  See Morgan, 536 U.S. at 116-17 ("Provided that an act contributing to the claim occurs within the filing period, the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.").

### III

We now address DeWalt's disparate treatment claim, reviewing the district court's grant of summary judgment de novo.  Habecker v. Town v. Estes Park, 518 F.3d 1217, 1223 (10th Cir. 2008).  Viewing the facts in the light most favorable to the nonmoving party, summary judgment is appropriate if "there is no genuine issue as to any material fact and . . . the movant is entitled to judgment as a matter of law."  Id. (quoting Fed. R. Civ. P. 56(c)).

To determine whether DeWalt's disparate treatment claim survives summary judgment, we apply the analytical framework outlined in McDonnell Douglas, 411 U.S. at 802-04, under which DeWalt bears the initial burden of articulating a prima facie case of discrimination.  Hardy v. S.F. Phosphates Ltd. Co., 185 F.3d 1076, 1079 (10th Cir. 1999).  To meet this burden, he must show

---

[10] Although some of the written reprimands were sent prior to July 5, 2003, and therefore fall outside the 300-day window of DeWalt's EEOC charge, Meredith has never challenged these claims as time-barred.

-16-

that: (1) he is a member of the class protected by the statute;[11] (2) he suffered an adverse employment action; (3) he was qualified for the position at issue; and (4) he was treated less favorably than others not in the protected class. Sanchez v. Denver Pub. Schs., 164 F.3d 527, 531 (10th Cir. 1998). DeWalt must simply raise a genuine issue of material fact regarding each element of the prima facie case. Hardy, 185 F.3d at 1079 n.2. We will consider evidence in DeWalt's testimony only if it is based on his personal knowledge and would be admissible at trial; we cannot consider "conclusory and self-serving affidavits." Garrett v. Hewlett-Packard Co., 305 F.3d 1210, 1213 (10th Cir. 2002) (quotation omitted).

The parties only dispute the second requirement of a prima facie case: whether, as a matter of law, any aspect of Meredith's conduct towards DeWalt constituted an "adverse employment action." Adverse employment actions include "acts that constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Dick v. Phone Directories Co., Inc., 397 F.3d 1256, 1268 (10th Cir. 2005) (quotation omitted). This list is not exhaustive, and "we liberally interpret the second prong of the prima facie case and take a case-by-case approach, examining the unique

---

[11] Because DeWalt was 51 years old at the time he alleges that the discrimination began, he has satisfied his burden on the first prong. See 29 U.S.C. § 631 (providing that an ADEA claim may only be brought by an individual age 40 or older).

factors relevant to the situation at hand." Id. (quotation omitted). At the same time, "a mere inconvenience or an alteration of job responsibilities" will not rise to the level of an adverse employment action. Id. (quotation omitted).

DeWalt alleges that Meredith took several adverse actions against him: (1) denying him vacation, (2) issuing written and verbal reprimands, and (3) constructively discharging him. Meredith argues that these are insufficient as a matter of law to sustain a prima facie case of discrimination. We agree.

**A**

DeWalt cites the lack of response to his request to take vacation time as an adverse employment action. If Meredith had denied a vacation request, we would certainly consider this an adverse action, because such conduct would significantly affect DeWalt's benefits. See Coffman v. Tracker Marine, L.P., 141 F.3d 1241, 1245 (8th Cir. 1998). DeWalt, however, did not formally request vacation, nor was vacation actually denied. Rather, DeWalt claims that he asked to "sit down" with Kurtwright to discuss his vacation plans, but that this conversation never occurred. Although it may have been inconvenient for DeWalt to fill out a formal request or to follow up with Kurtwright about vacation time, such a minor inconvenience falls short of an adverse employment action.

With respect to the reprimands DeWalt received, "[a] written warning may be an adverse employment action only if it effects a significant change in the plaintiff's employment status." Haynes, 456 F.3d at 1224. Likewise, verbal

-18-

reprimands do not qualify as adverse actions unless there is evidence that they affected the employee's job status.  Sanchez, 164 F.3d at 533.  In this case it is unclear what effect, if any, the written and verbal reprimands had on DeWalt's employment status.  The memoranda DeWalt received do not mention discipline or suggest that disciplinary action might follow.[12]  DeWalt testified that he was not punished or docked pay as a result of any of the incidents mentioned in the memoranda.  Kurtwright's letters do instruct DeWalt to fill out maintenance forms when necessary and to keep company vehicles clean and in good order, but there is no indication in the record that these expectations represented "significantly different responsibilities" than DeWalt previously held.  See Dick, 397 F.3d at 1268.  Similarly, although Ducas characterized his conversation with DeWalt regarding the snowstorm incident as a verbal "warning," which would be the first step in a series of disciplinary actions, DeWalt does not suggest that he was threatened with further discipline during the conversation, and no disciplinary action followed.  Other than DeWalt's assertion that these reprimands

_____

[12] During deposition, DeWalt stated that he did receive one letter that "talked about dismissal" but he could not provide a copy of it.  Moreover, he did not specify when he received this memorandum, who sent it, why it discussed termination, or who else received it.  Even if this evidence were admissible, see Garrett, 305 F.3d at 1213, a question which the district court did not reach, DeWalt has not explained how it supports his claim.  Without contextual information, we cannot determine whether the memorandum amounted to an adverse action.  See Haynes, 456 F.3d at 1224.  Nor can we ascertain whether DeWalt was treated less favorably than younger employees, who may or may not have received similar memoranda.  See Sanchez, 164 F.3d at 531.  Accordingly, we decline to consider DeWalt's allegation regarding this memorandum.

-19-

caused him to feel "nitpick[ed]," he has failed to identify any tangible negative consequences on his employment status. As such, the reprimands do not qualify as adverse employment actions.

**B**

DeWalt also alleges that he was constructively discharged. A plaintiff can meet the second requirement of the prima facie case by showing that he was forced to resign and therefore he was effectively terminated. Fischer v. Forestwood Co., 525 F.3d 972, 979 (10th Cir. 2008). DeWalt asserts that his working conditions at KCTV became so unbearable that he had no choice but to resign. Even viewing the evidence in the light most favorable to his case, we disagree.

An employee is constructively discharged "when an employer deliberately makes or allows the employee's working conditions to become so intolerable that the employee has no other choice but to quit." MacKenzie, 414 F.3d at 1281. In reviewing a constructive discharge claim, we apply an objective test, asking "whether a reasonable person would view the working conditions as intolerable," not whether the plaintiff subjectively felt that he must quit. Id. We have noted that "[t]he bar is quite high" when it comes to showing that the employee had no option other than resignation. Garrett, 305 F.3d at 1221. "The question is not whether working conditions . . . were difficult or unpleasant," but rather whether the plaintiff's decision to resign can properly be characterized as involuntary.

Exum v. U.S. Olympic Comm., 389 F.3d 1130, 1135 (10th Cir. 2004) (quotation omitted).

In support of his constructive discharge claim, DeWalt points to the general harassment of older employees, Kurtwright's and Ducas' reprimands for minor errors, and his transfer to the night shift, which affected his physical and mental health as well as his home life. These facts certainly indicate that his working conditions, particularly his night shifts, were unpleasant, and he urges that, as a subjective matter, they were intolerable. We cannot conclude, however, that they were objectively intolerable, such that a reasonable person would have felt that he had no other choice but to quit.

Regarding the verbal and written reprimands, DeWalt was rebuked for relatively minor mistakes, but these reprimands were not harshly worded or threatening. See Breeding v. Arthur J. Gallagher & Co., 164 F.3d 1151, 1160 (8th Cir. 1999) (holding that "a feeling of being unfairly criticized" is insufficient to show constructive discharge (quotation omitted)). Neither Kurtwright nor Ducas suggested that DeWalt would be disciplined as a result of his errors, and they never indicated that DeWalt faced termination.[13] Cf. Spulak v. K Mart Corp., 894 F.2d 1150, 1153 (10th Cir. 1990) (jury could reasonably conclude that the plaintiff was constructively discharged when he was threatened with termination).

_____

[13] For the same reasons as described above, we decline to consider DeWalt's allegation regarding a letter that "talked about dismissal."

With respect to the night shifts, although DeWalt subjectively viewed the shift as a step down, he was not actually demoted, nor were his pay or benefits reduced. See Greenberg v. Union Camp Corp., 48 F.3d 22, 27 (1st Cir. 1995). He also never requested a transfer back to the day shift. See Sanchez, 164 F.3d at 534. Although DeWalt suggests that any complaint or request for improved working conditions would have been futile, we cannot conclude that the evidence, even viewed in the light most favorable to him, shows that he had no other choice but to quit.

Because the situation alleged by DeWalt is insufficient as a matter of law to establish the he was constructively discharged, and he has not demonstrated any other adverse employment action, we affirm the grant of summary judgment to Meredith on DeWalt's disparate treatment claim.

**IV**

DeWalt alleges that the overall work environment at KCTV was hostile to older employees. To survive a summary judgment motion, DeWalt must show that "a rational jury could find that the workplace was permeated with discriminatory intimidation, ridicule, and insult, that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." MacKenzie v. City & County of Denver, 414 F.3d 1266, 1280 (10th Cir. 2005) (quotation and alteration omitted). Of course, he must also show that this harassment was based on age. See Sandoval v. Boulder Regional

-22-

Commc'ns Ctr., 388 F.3d 1312, 1327 (10th Cir. 2004). In evaluating DeWalt's hostile environment claim, "we examine all the circumstances, including: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's work performance." MacKenzie, 414 F.3d at 1280. We ask whether, taken together, these circumstances establish that the environment was objectively and subjectively hostile. Id. But in order to prevent the ADEA from becoming "trivialized as a civility code," we must "filter out offhand comments, and isolated incidents," as well as "the sporadic use of age-related jokes, and occasional teasing." Id.

DeWalt directs our attention to several ageist comments made by Meredith management. He personally heard Kevin O'Brien refer to KCTV employees as "dinosaurs" and talk about the "Old Meredith," and heard Alvie Carter, who was not a senior manager, state jokingly that DeWalt and others had been moved to the night shift "because you guys are old."[14] Standing alone, these comments are insufficient to show that the KCTV workplace was permeated with discriminatory insult. See MacKenzie, 414 F.3d at 1280; see also Chavez v. New Mexico, 397

_____

[14] DeWalt also relies on a statement from Ducas, as reported to DeWalt by other employees, regarding management's instruction to "fire all the old reporters." Because other employees' descriptions of the remark fall outside DeWalt's personal knowledge, we do not consider this alleged comment. See Garrett, 305 F.3d at 1213.

F.3d 826, 832 (10th Cir. 2005) (holding that two racially offensive remarks fell "far short of the 'steady barrage' required for a hostile environment claim").

In addition to the specific ageist comments, DeWalt contends that managers at KCTV consistently harassed older employees by "nitpicking" their work performance. For example, DeWalt claims that Kurtwright unfairly criticized him regarding the trash in the live truck, and one engineer reported that Ducas "jumped on" him several times, presumably for relatively minor mistakes. Although we view these criticisms in the light most favorable to DeWalt, we cannot conclude that they were sufficiently severe or humiliating as to create a hostile work environment. MacKenzie, 414 F.3d at 1280. Accordingly, we affirm the grant of summary judgment to Meredith on this claim.

## V

For the foregoing reasons, we **AFFIRM** the grant of summary judgment in favor of Meredith.

ENTERED FOR THE COURT


Carlos F. Lucero
Circuit Judge